UNITED STATES v. FREEL.   See note to Case No. 15,624.

─────────

## Case No. 15,162.

### UNITED STATES v. FREEMAN.

[4 Mason, 505.] [1]

Circuit Court, D. Massachusetts.   Oct. Term, 1827.

HOMICIDE—SEAMEN—DUTIES OF MASTERS—CHARACTER—WITNESSES.

1. If a seaman is in a state of great debility and exhaustion, so that he cannot go aloft without danger of death or enormous bodily injury, and the facts are known to the master who, notwithstanding, compels the seaman, by moral or physical force, to go aloft, persisting with brutal malignity in such course, and the seaman falls from the mast and is drowned thereby, and his death was occasioned by such misconduct in the master, under such circumstances, it is murder in the master.

[Cited in U. S. v. Trice. 30 Fed. 492.]

2. If there be no malice in the master, the crime is reduced to manslaughter.

[Cited in brief in State v. Conley, 39 Me. 83.]

3. Of the rights and duties of masters as to the punishment of seamen.

[Cited in Fuller v. Colby, Case No. 5,149.]

[Cited in Buddington v. Smith, 13 Conn. 336.]

4. In what cases general character may be given in evidence.

5. Seamen are deemed in law credible as well as competent witnesses, and their testimony is to be weighed like other witnesses'.

Indictment against the defendant [William D. Freeman] for the murder of one David Whitehead, on the high seas, on board of the brig Floyd, of which the defendant was master, and Whitehead a seaman, and one of the crew, on the 28th of April, 1827. The indictment laid the charge in two counts. The first stated, that the prisoner made an assault upon Whitehead, and threw him overboard, and he was drowned. The second stated, that the prisoner, being master of the brigantine Floyd, and Whitehead an ordinary seaman on board the said vessel, but in a weak state of body, and unable to perform the duty of a seaman, and the prisoner, knowing that Whitehead was unable to perform his duty, wilfully ordered and compelled him, without his consent, and against his will, to go aloft upon the mainmast and rigging of the vessel, and that Whitehead, by said compulsion, attempting to go up aloft, by reason of his weakness of body fell overboard into the sea and was drowned, whereby said Freeman wilfully murdered said Whitehead.

Six witnesses were produced and examined on the part of the government, all of them sailors on board of the brig at the time of Whitehead's decease, and who, together with Whitehead, the prisoner, and the mate of the brig, made up the complement of the brig's crew. These witnesses, together with the mate, who was examined on behalf of

1 [Reported by William P. Mason, Esq.]

the prisoner, concurred in testifying, that the prisoner had uniformly treated the deceased with great severity and brutality. The following was the testimony of the first witness examined on the part of the government, which was confirmed by the other witnesses, and does not differ materially from the evidence given by the mate. who was examined on the part of the prisoner:

Thomas Richardson, of Southborough. was on board the Floyd, shipped in Charleston, S. C., went on board 10th of April, bound to Antwerp. The crew consisted of all that had been sworn as witnesses,' and one more, also a young man named David Whitehead, who shipped as cook; nine in all, officers included. William D. Freeman, prisoner, was commander. Shipped at $18 a month, with small stores; Whitehead at $16. He was a young man about 23; had not been to sea long; don't know whether he was able to perform the duty of cook, for he had not a chance to try. The crew went on board the 10th, and sailed the 15th. Whitehead served as cook till the 23d or 24th. He then exchanged with John B. Davison, who had shipped at Philadelphia at $10 a month; understood that Whitehead agreed to take the $10. Witness never heard the captain agree to, or object to the exchange. Before they went over the bar, W. was beat and cuffed, so that he became so stupified, that he had no chance to do any thing. The captain was continually calling on him, beating him, cuffing, and pulling him by the hair. He never went into the cabin without being beat. Never had a chance to do any thing without being called upon, interrupted, and ordered to do something else. On the 25th, he was sent up, with another hand, to let a reef out of the foretopsail, and by accident he left one point untied, which, in hoisting the sail, split the topsail. When the captain came on deck and saw the hole, he asked how it came, and being informed, took Whitehead and beat him with his fist and a piece of rattling stuff, and kicked him. Witness afterwards saw marks, where the skin was broken, on his head, and black spots on his arms, and other parts of his body. The captain then sent him to the galley, and the next day lashed him to the ring bolt, where he was kept 24 hours, and afterwards lashed him 24 hours to the rail. His hands were lashed behind him with spun yarn, and he was lashed round his middle with a rope to the ring bolt. When he was lashed to the rail, the captain took a stick from the tar bucket, and put it into his lips, then laughed at him, and asked him where he had been stealing molasses. The weather at this time was very cold and severe. The captain asked him if he wanted a dram. He said he should like one. The captain replied, "I will give you a dram that will fix you," and then put two doses of tartar emetic into a glass of New England rum, and gave it to him. It made him vomit very

much. The captain swore fifty times, that he would never be satisfied until he saw his end. Before being tied, the captain sent him up to scrape the main topgallant mast. He did not scrape to the captain's satisfaction, and he went up after him with a piece of rope in his hand, and took hold of the rigging and tried to shake him off, while he was holding by the mast with one hand and scraping with the other. When lashed to the ring bolt he had nothing to eat; and when lashed to the rail nothing but half a biscuit and about a pint of water, or half a pint. The biscuit was broken up and laid upon a cask, and he was obliged to eat it like a beast. The weather was cold, and the captain obliged W. to pull off one pair of trowsers, and he was exposed to the cold and wet with only a pair of duck trowsers on; the sea continually breaking over him. In the afternoon of the 27th, after taking the tartar emetic, the captain took off the rope, and asked him if he was able to perform his duty as cook. He said he was. The captain said he lied; took him by the hair of his head and whipped him; then holding up the rope to the crew, said, "Antwerp and Boston will uphold me in this." After he had done beating him, he tied him to the rail with an inch and a half or two inch rope, in the middle of the deck, so that he should have nothing to lean against, set him to watch the sea gulls, and asked him what colour their heads were, and when he answered, said he lied. Witness examined the spun yarn, having made it himself, was two or three yarn spun yarn; was tied by the captain as tight as he could draw it, and the hands of the deceased were very much swollen, and as black as a hat. Witness examined his hands previous to his going up aloft; they were stiff and much swollen, so that he could hardly close his thumb and finger. He was so weak, that when the vessel rolled he could not stand properly on his feet. On the morning of the 28th, the captain ordered the mate to make a large scrubbing brush, too large for any man to use, and with that ordered W. to scrub the deck on the weather side. He appeared then unable to do duty. Immediately afterwards, at 8 or 12 o'clock, the hands were called to hand the mainsail; five went on to the yard. Witness at the helm. W. being then scrubbing, the captain asked the mate why he did not send that damned soldier aloft to hand the mainsail. The mate replied, that he was not able to go aloft. Witness also told the captain, that so sure as that man went aloft, he would never come on deck again alive. The captain said, "Damn him, send him aloft;" and took up a piece of rigging and struck him, saying, "Damn you, start along. I never shall be satisfied until I do see the end of you. Now, damn you, away with you aloft." The man crawled up the rigging very slowly, and reached the yard. He went upon the lee yard, and had just got to the end of the yard. A man next to him said, "David, come try and hand me in the beck if you can." He attempted to get hold of the beck of the sail, and he fell overboard, not being able to hold on any longer. He struck upon the rail, and fell overboard. Witness heard him after he was overboard, luffed the vessel, made some attempt to get the jolly boat down, but found it would be of no use; and besides the sea was heavy, and it would have been dangerous to put to sea in it. The vessel was then a little to the westward of the Grand Banks, and there was no vessel in sight. The crew said, "The poor fellow is gone." The captain said nothing. Witness told the captain, he hoped he would now be satisfied; he had said he would be the death of him, and by his means he was now dead. The captain made no reply. Whitehead, on board of the vessel, was as civil a man as witness ever was with. Had not much skill as a sailor. In answer to a question, how he knew that the captain put two doses of tartar emetic in the drink that he gave to the deceased, said, that he told the mate, and mate told the witness. When Whitehead came on board, he was very hearty, strong, and lively. On being cross-examined: Whitehead, with Pearson, one of the crew, attempted to escape from the vessel before she left the harbor of Charleston, but they were retaken and brought back. The captain did not, on the voyage from Charleston to Antwerp, and thence to St. Ubes and Boston, strike any other of the crew, but used very harsh language to them. Witness had a quarrel with the captain about some twine. He had been, with the other witnesses, confined in jail for the last three weeks, to secure their attendance at this trial. When Whitehead was tied to the ringbolt, he was lashed down, in a sitting posture, so that he could not get up; when to the rail, he was standing, and at a distance from the rail, so that he should have nothing to lean against. There was some complaint of the cook, by the crew, before they left Charleston harbor, that he did not cook well.

Several very respectable witnesses were examined in the defence, who testified to the general good character of the prisoner, for many years previous to this event. Several other witnesses also testified, that some of the sailors, who were witnesses on the part of the government, had expressed to them, or in their presence, great enmity towards the prisoner, and one of them testified, that Richardson, whose testimony is given above, gave the witness an account of the transaction, and said, that the captain was a damned rascal, and ought to be hung, and that he meant to do the best he could to get him hung; that the crew had all sided against the captain, and he offered to bet with the witness ten dollars against five, that he would be hung. The defendant pleaded not guilty.

The trial was conducted by Mr. Blake, U. S. Dist. Atty., for the United States, and by Messrs. Sewall and Bassett for the prisoner. The former cited Act Cong. 1825, c. 67, § 3; 8 Laws [published by authority, 4 Stat. 115]; 4 Bl. Comm. 194; 1 Hale, P. C. 431; 2 Strange, 856; Palmer, 545; Fost. Crown Law, 32, 322; 3 Chit. Cr. Law, 725; Hawk. P. C. bk. 1, c. 31, § 4; 2 Ld. Raym. 1578. The latter cited 1 East, P. C. 218, 225, 226, 262; 1 Russ. P. C. 755; 3 Chit. Cr. Law, 842, note; 1 Starkie, Ev. 506, 511; 2 Starkie, Ev. 959. It was admitted, that the brig Floyd was owned by American citizens resident in Boston, and was duly registered, and that the defendant, Freeman, was master on the voyage.

STORY, Circuit Justice, in the course of his summing up to the jury, stated his opinion as follows:

This is an indictment for murder on the high seas; and it is competent for the jury, upon a view of the whole matter, either to acquit the defendant of all guilt, or to convict him of the crime, as alleged in the indictment, or to find him guilty of manslaughter. There are some general considerations, upon which the arguments at the bar render it necessary for the court to bestow a passing comment. In the first place, the general good character of the defendant may be properly brought into the cause, and ought to have weight with the jury in all cases, where the facts are doubtful, or admit of different interpretations. But where the evidence is positive, and satisfactory to the jury, such good character certainly cannot overcome the just presumption of guilt arising therefrom; for such is the infirmity of human nature, that men, even of exemplary life and character, are sometimes suddenly betrayed into excesses, and hurried on, by their passions, to the commission of the grossest offences. Previous good character is therefore a circumstance entitled to the consideration of the jury, and ought to be thrown into the scale in favor of mercy; but if the facts, which establish the guilt of the party, are supported by proofs entirely credible and unexceptionable, there is no pretence to say, that a jury is bound to acquit the party merely because of such character. In the next place, as to the position, which has been so strongly urged at the bar in defence of the accused, that common seamen are not entitled to belief, though their testimony is given under oath in a court of justice. There is no such rule of law in respect to this class of persons. Seamen, like other persons, if not interested or infamous, are competent witnesses in the trial of criminal as well as civil causes. The law has pronounced no general sentence of exclusion against them; and there is nothing, in their course of life, or general characters, which would warrant such a harsh and vindictive proceeding. They are competent witnesses, and their credit is to be left to the jury, to be judged of under all the circumstances of each case. Their testimony is open to every suggestion arising from their individual characters, their station in life, their manner of testifying, the nature of the facts related by them, their prejudices, and passions, and feelings, and indeed all the considerations which abate the force of evidence in every other case. They have a right to be heard in what they testify under oath, like other men; and the jury, who should wholly disregard their testimony, simply because they were seamen, and thus involve the whole class in one indiscriminate proscription of discredit, as contended for at the bar, would betray their proper duty, and supercede, instead of enforcing the law.

In the next place, as to the rights and duties of masters of ships, in relation to the crew, during the voyage. It is doubtless true, that the master has a right to require of them a prompt and ready performance of duty, and an habitual obedience to reasonable commands at all times. The safety of the ship and the success of the voyage essentially depend upon the due enforcement of this right. And in proportion as the urgency of the occasion, and the necessities of the sea service, require instant compliance with such commands, the duty of the seamen to obey becomes more pressing and obligatory. If obedience does not follow, the master may compel it by punishment, and the nature and extent of the punishment must be decided by the exigency of the case. The master may also apply punishment, by way of correction, for past as well as present offences, to preserve the good order and discipline of the ship. But, after all, however summary or strict may be his power, it is not unlimited, nor is it to be exercised in an arbitrary, cruel, or revengeful manner. The authority of the master, on board the ship, is nearly allied to that of a parent, and is to be used with reasonable tenderness and humanity. No punishment can be inflicted unless for reasonable provocation or cause; and it must be moderate, and just, and proportionate to the nature and aggravation of the offence. The law does not permit the master to gratify a brutal and low revenge, or to inflict cruel and unnecessary punishments. It allows no excess, either in the mode, or the nature, or the object of the punishment. It upholds the exercise of the authority only when it is for salutary purposes, not when it arises from personal prejudice, caprice, or dislike, or from gross and vindictive passions. In every case, therefore, where punishment is applied, the master is responsible, both civilly and criminally, if he wantonly exceed the measure of justice.

In respect to the general principles of law, applicable to cases of homicide, there has

been no controversy at the bar; and I am spared the necessity of expounding them beyond what has been read from approved authorities. But the circumstances of this case call for an explicit instruction to you upon the points made in the defence. These are: (1) That the death of Whitehead (the seaman, whose death is feloniously charged in the indictment), was solely owing to accident and misadventure in the course of his duty, the fall from the yard not being occasioned by his debility, but by circumstances which might have occasioned it to a healthy seaman. (2) If his death was not owing to accident or misadventure, but simply to his debility, yet the circumstances of the case do not show, that such debility was so known to the master, that the order, that he should go aloft, was unjustifiable or wantonly wrong. (3) That if the order was not strictly justifiable, still the act was not the result of personal malice to the deceased in particular, nor of brutal and malignant passions or feelings, which establish general malice, and, therefore, in no event can the facts justify a conviction of murder. (4) That it is not a case even of manslaughter; for there was not such a want of caution, or such gross negligence in the master, as would, in the absence of malice, justify a verdict of manslaughter.

The first inquiry proper for the jury then is, whether Whitehead came to his death by mere accident or misadventure; or whether it was occasioned by his debility and exhaustion, arising from physical infirmity at the time of his fall from the yard. If occasioned by such debility and exhaustion, the next inquiry ought to be, whether that state of debility and exhaustion was fully known to Capt. Freeman, when he gave the orders for his, Whitehead's going aloft. If so, were the circumstances such as, that Capt. Freeman must, and ought to have foreseen, that the enforcement of his order to go aloft would probably be attended, either by death or enormous bodily injury by falling, to Whitehead, so that the jury can justly infer, that it must have been persisted in from personal malice to the deceased, or from such a brutal malignity of conduct, as carries with it the plain indications of a heart regardless of social duty, and fatally bent on mischief. If so, it was murder. And it would not vary the case, that the moral force of the authority of the master to compel performance, instead of physical force, produced compliance with the order on the part of Whitehead, although the latter was sensible of his own extreme debility.

If the jury are not satisfied, that there was either actual malice to the deceased, or constructive. malice, arising from brutal malignity, as before mentioned; still, if the circumstances of the case show, that there was gross heedlessness, want of due caution, and unreasonable exercise of authority on the part of Capt. Freeman, and that he ought to have known, and could not but have known, that Whitehead was unfit to go aloft, and that there was probable and immediate danger to his life in his so doing. then, notwithstanding the absence of such malice, the offence is at least manslaughter. For every act done wilfully, and with gross negligence, by any person, the known effect of which, under the circumstances, must be to endanger life, is, if death ensues, at least manslaughter.

(The judge then proceeded to sum up, and comment at large, upon the facts, in the various aspects thus presented of the case, and concluded by leaving it to the jury, upon the whole evidence, under the foregoing instructions as to the law.)

Verdict, guilty of manslaughter, and sentence accordingly.

See, as to what constitutes murder, 1 East, P. C. 214, 225, 226, 231, 256, 257. As to what constitutes manslaughter, 1 East. P. C. 218, 219, 227, 231, 257. As to the effect of negligence in cases of homicide, when it makes the act felonious or not, 1 East, P. C. 227, 231, 257, 261, 265.