STATE OF IOWA, v. JOHN WARNER, Appellant.

**Criminal law:** EVIDENCE: IMPEACHMENT OF WITNESSES.   Where the defendant in a criminal action calls one of the witnesses examined by the state and makes him his own witness, he becomes subject to impeachment on rebuttal the same as any other witness for the defendant.

**Same:** *Res gestae.*   The statements of a third person regarding the circumstances of an affray made to a physician when calling him to attend the injured person are admissible as part of the *res gestae.*

**Same:** EVIDENCE: INSTRUCTIONS: HARMLESS ERROR.   Where a witness for defendant testified that neither he nor defendant had been drinking on the day of the accident and were not intoxicated at the time, evidence of the condition of the witness when calling a physician shortly afterward and of statements regarding their drinking, when limited to the question of intoxication of the witness, was not prejudicial.   And where the court charged that the evidence could only be considered on the question of whether the witness was intoxicated at the time of the accident, refusal to charge that it could not be considered as proving that defendant was shooting at decedent's hat when he was injured was not erroneous; especially as it will be assumed that the jury followed the instruction.

**Same:** MANSLAUGHTER: NEGLIGENT USE OF DANGEROUS WEAPONS: INSTRUCTIONS.   The use of deadly and dangerous weapons in a careless and reckless manner is such gross negligence as makes the act criminal, and if the act results in the death of another the accused is guilty of manslaughter.   Under the evidence in this case it is held that the court correctly defined and submitted the issue of manslaughter, growing out of the negligent use of a dangerous weapon.

*Appeal from Van Buren District Court.*—HON. C. W. VERMILLION, Judge.

SATURDAY, SEPTEMBER 21, 1912.

DEFENDANT was indicted for the crime of manslaughter, due to the reckless and careless use of a deadly weapon. Upon trial to a jury he was convicted of the crime charged and appeals.—*Affirmed.*

*J. C. Mitchell* and *Walker & McBeth,* for appellant.

*George Cosson,* Attorney General and *John Fletcher,* Assistant Attorney General, for the State.

DEEMER, J.—On the afternoon of Sunday, May 7, 1911, defendant, with William Gillespie and one other, went from the town of Bentonsport to a shed at the railway stockyards in said town and there found five other men playing poker, among whom was the deceased, Howard Runyon. The men were about a car door lying across some logs. Defendant was carrying a twenty-two caliber rifle with him, and when he arrived he said to deceased, "Bunny" (meaning the deceased), "let me shoot at your hat." Deceased took off his hat and threw it some feet distant and southward from where he was sitting, evidently in response to the request. At any rate, defendant immediately shot at it several times, amidst laughter from the crowd, and finally deceased went and got it, remarking to defendant, "Are you satisfied?" Having regained his hat, he went back to his place and resumed the game. In a few minutes defendant again discharged his gun, this time in the direction of Runyon; the ball puncturing his (Runyon's) skull, resulting in death in a few hours. Just before the shot was fired, some one in the party, observing that defendant was pointing his gun in the direction of the deceased, cried out, "Look out Bunny, he is going to shoot." Immediately the fatal shot was fired.

The state does not claim that the shoting was intentional, but insists that it was done with such reckless disregard of human life as to constitute involuntary man-

slaughter. On the other hand, it is contended for defendant that the shooting was wholly accidental, and that no crime was committed. Testimony was adduced tending to show that the accused either deliberately aimed at the hat which deceased had replaced upon his head, thinking that he was expert enough to puncture it without injuring deceased, or that he was aiming at some nail or imaginary mark just over the head of the deceased and by reason of bad marksmanship or through some factitious circumstance hit the deceased in the head instead of the mark which he had selected. Immediately after the shooting, defendant remarked, "If they had kept their mouths shut, it would not have happened," having in mind, no doubt, the cry of warning made to deceased by one of the bystanders. His claim at the trial was that he was shooting at a certain nail head the range of which was but a short distance over the head of the deceased as he was sitting in a crouched position over the improvised table while the cards were being dealt, and that hearing the warning cry he (deceased) raised his head and body so that his head came within range, and thus received the wound from which he died. Learned counsel for appellant recognize that the case made for the state was for a jury and that there is abundant testimony to support the verdict; and we may, with propriety, add that the only excuse which can be offered is that all interested parties were more or less intoxicated and all more or less engaged in illegal acts. But neither of these things palliate, much less excuse, the act. According to defendant's own testimony, he was aiming at and intending to shoot at a small mark so nearly in range with Runyon's head that by raising it a few inches he brought it into such position as to receive the ball. It is said that defendant was an expert marksman and might reasonably have supposed that he could imitate William Tell; but we doubt if an expert

would undertake any such hazardous performance, and his excuse is far from Tellian in character.

The real points relied upon for a reversal revolve around three propositions: First, it is contended the court erred in the admission of testimony; second, that it erred in giving certain instructions and refusing certain others with reference to what constitutes involuntary manslaughter; and, third, that it erred in giving an instruction to the jury after it had been out for some hours with reference to its duty in the premises.

I. William Gillespie was a witness for the state and was examined fully regarding the circumstances attending the shooting. He was also called by defendant as a witness on his behalf after the state had rested, who had him testify as to his meeting him (defendant) about eleven o'clock in the morning of the day of the homicide and of what occurred from that time down to the time of the shooting. One of the objects of this was to show that defendant was not intoxicated at the time of the shooting. Indeed, he testified in chief directly that defendant did not drink anything from eleven o'clock a. m. until the time the fatal shot was fired, and that neither he nor the defendant had been drinking or were intoxicated, that day. On cross-examination he was asked the following questions, to which he made the answers indicated:

I went after Dr. Schee. I had some conversation with him. Q. I will ask you whether or not the doctor said this to you and you then said in reply, 'You fellows have been boozing some down there today,' and you said, 'Well, not very much.' A. No, sir. Q. You did not say that to Dr. Schee? A. No, sir; I did not say it. Q. I will ask you whether or not you stated to the doctor, at that time, and as a part of that conversation, something like this: 'This thing of shooting at a man's hat when on his head is not right.' A. No, sir; I did not say that. Q. And isn't it a fact that the doctor said to you, 'Did Warner

shoot at the hat when on his head?' and you replied, 'Yes, sir; he did.' (Same objection as before.) The Court: I think I will sustain the objection as to this last question. The objection to the question asked of this witness as to what he said to Dr. Schee concerning the shooting of the hat is sustained and withdrawn from the consideration of the jury, and they are not to consider it for any purpose.

The doctor referred to in this record was in due season called as a witness by the state in rebuttal, and the following record was made:

Will Gillespie came for me on the day Howard Runyon was shot. Q. What would you say to his condition, as to whether or not he was intoxicated or otherwise? A. Well, I would not say that he was badly intoxicated, but I would say that in my opinion he had been drinking. To a certain extent he was under the influence of liquor. Q. I will ask you to state whether or not you said something to him like this, 'You fellows have been boozing down there some to-day,' and he replied, 'Well, not very much.' A. I asked that in the form of a question. I think I said, 'Haven't you?' Q. And what did he say? (Same objection and ruling as last above. Excepted to.) A. 'Well, not very much.' (The witness was then cross-examined by defendant's counsel and the following elicited): 'Among other things, he said that Bunny Runyon had been shot or scalped down at the stockyards by John Warner, and he wanted me to go down and tend him. He said it in a very clear, intelligent way, so that I understood it very plainly. He said it just as clearly and as plainly as a sober man would say it. He was somewhat excited and seemed alarmed.

On redirect the following record was made:

Q. You say that when Gillespie came up there he says, 'Bunny Runyon has been scalped, and I want you to go down there'? A. I think he said 'had been scalped by John Warner shooting with the rifle.' Q. Was that all he said? A. No, sir. Q. What else did he say? (Defendant objects to that. We did not call for it.) The

Court: It may go in as bearing on Gillespie's condition at the time. (The ruling of the court is excepted to.) Defendant's Attorney: We object to anything else that was said as not rebuttal and hearsay. The Court: Same ruling. (Same exception.) A. He said, 'This thing of shooting at a man's hat when it is on his head ain't right.' Defendant's Attorney: We move to strike out the answer as not rebuttal. The Court: The evidence is received only as it may bear on Gillespie's condition at the time, and not as any contradiction of Gillespie's testimony to be inferred from the alleged statement, but only bearing, if it does, on Gillespie's condition at the time the statement was made. (To which ruling of the Court the defendant excepts.) Q. Was anything else said by you to Mr. Gillespie? A. Yes, sir; I made the reply to that statement, but if that is overruled— (Defendant objects for the same reason as before.) The Court: I don't see how it is material. He may answer. (To which ruling the defendant excepts.) A. He made that statement that I have just repeated, and I said, 'Did Warner shoot at the hat when it was on his head?' A. Yes, sir. Defendant's Attorney: We move to strike out the last answer as incompetent, immaterial, hearsay, and not rebuttal. The Court: Overruled, but the evidence is only introduced, as bearing, if it does, on Gillespie's condition of intoxication or otherwise at the time, but it is not to be considered for any other purpose whatever. (To which ruling defendant excepts.)

Except as shown, each and all the questions put to this witness on his direct or redirect examination were objected to by defendant's counsel upon every conceivable

1. CRIMINAL LAW: evidence: impeachment of witnesses.

ground. The chief argument now made is that the state should not have been permitted to impeach its own witness and should not have been allowed, under the guise of rebutting the defendant's case, to put into the record hearsay and incompetent testimony. There is nothing in the first of these contentions. Defendant made Gillespie his own witness and elicited from him certain evidence which had not been called for or inquired into when the witness was

upon the stand for the state. Having done so, the witness was subject to impeachment the same as any other witness, and it was entirely competent for the state to show by declarations of Gillespie that both he and defendant were intoxicated or had been drinking on the day in question. *Hall v. Manson,* 99 Iowa, 698.

There is more trouble with that part of the testimony relating to what Gillespie said regarding how the shooting occurred. We are satisfied, however, that what

2. Same: *res gestae.* the witness said to the doctor explanatory of his call upon him in a professional capacity to go to the wounded man was part of the *res gestae* and admissible as such. *State v. Cross,* 68 Iowa, 180.

The last question propounded to the witness and his answer thereto present even greater difficulty. It was manifestly not received as showing contradictory state-

3. Same: evidence: instructions: harmless error. ments made by the witness, for the court did not allow the foundation to be laid for that kind of impeachment. Indeed, we do not have to indulge in surmises, for the court expressly said that the testimony was admitted for no other purpose than as bearing upon Gillespie's condition as to intoxication. In addition to stating at the time the object and purpose of the testimony, the court gave the following instruction with reference to the matter:

(14) Evidence has been admitted tending to show alleged statements of the witness Gillespie to Dr. Schee concerning the manner of the shooting. This evidence is to be considered only as bearing, if it does, upon the question of whether said Gillespie was intoxicated, and is not to be considered for any other purpose or as tending in any way to prove the manner of said shooting. Evidence tending to show that the witness Gillespie had made statements to Dr. Schee in reference to the alleged drinking of intoxicating liquor by said Gillespie or the defendant on the day of the shooting is not to be considered as any evidence of the alleged fact, but only as bearing, if

it does, on the credit to which the witness Gillespie is entitled.

With reference to this matter the defendant's counsel asked the following instruction: "No. 6. You are instructed that you can not and must not consider the testimony of Dr. Schee, in reference to what the witness Gillespie may have said as to the shooting at the hat while on the head of the deceased, as at all proving or tending to prove that defendant was so shooting at the hat when the deceased was struck. That testimony of Dr. Schee does not tend to prove any such matter." This was refused. In so far as the instructions go, there is little difference between the one given by the court and this. The one given says that the testimony should be considered for but one purpose, and not then unless it bore thereon, and expressly declared that it should not 'be considered as tending in any way to prove the manner of the shooting. It more closely limited the application of the testimoney than the one asked by the defendant, and expressly said that the testimony was to be considered only as bearing, if it does, upon the question of Gillespie's intoxication. In this connection it is well to remark that we do not see any logical connection between the remark and witness' intoxication, save on the possible theory that, having denied part of the conversation, he must have been so drunk that he did not know what he had said to the doctor when he went after him. But if it had no logical bearing upon that proposition, we do not see how defendant was prejudiced, for the jury was expressly told that the testimony should not be considered for any other purpose and especially advised that it had no bearing upon the manner of the shooting.

We must assume that the jury followed the instruction, and with that assumption no prejudice could possibly have resulted.

II. The state rested its case entirely upon the theory that

the offense was one of involuntary manslaughter, and the court in adopting this theory gave the following, among other, instructions:

(3) The material averments of the indictment are that the defendant did, at the time and place therein alleged, handle the rifle therein described in a careless and reckless manner, and while so doing did unlawfully, carelessly, and recklessly shoot Howard Runyon in the head, thereby causing the death of said Runyon.

4. SAME: manslaughter: negligent use of dangerous weapons: instructions.

(4) Manslaughter is the unlawful killing of one human being by another without deliberation, premeditation, or malice, as where one engaged in an unlawful act, not amounting to a felony, unintentionally kills another; or, if one recklessly and heedlessly fires a gun and thereby kills another, he will not be excused, but his offense will be manslaughter, though the weapon was pointed in the direction of the deceased by accident with no design to wound or kill.

(5) The defendant in handling a deadly and dangerous weapon was bound to exercise such care as an ordinarily careful and prudent man would ordinarily exercise under like circumstances, and if he failed to do so he was guilty of negligence. He was not required to exercise the highest degree of care, but only such care as a reasonably prudent man should and ought to use under like circumstances. If he did so, then the killing of deceased would be excusable, and he should be acquitted; but if you find from the evidence beyond a reasonable doubt that he failed to exercise such degree of care and that he was guilty of negligently and recklessly using such weapon, whereby the deceased was shot and killed, such killing would be manslaughter.

(6) If you find from the evidence beyond a reasonable doubt that at the time and place alleged in the indictment the defendant was intending to shoot through the hat of deceased while the same was on his head, and that in so doing he was using a deadly and dangerous weapon recklessly, carelessly, and negligently, or so find that in aiming at or shooting at a nail head, if he was, defendant was shooting so close to deceased as that his act

in so doing was a negligent, careless, and reckless use of a deadly weapon and that by reason of such reckless and negligent use of such weapon said Runyon was shot and killed, such killing would be manslaughter.

(7) If you find that at the time he fired the fatal shot the defendant was aiming at a nail head, but further find from the evidence beyond a reasonable doubt that in so doing he recklessly pointed said gun so close to the deceased and fired the same under such circumstances as that he was not, in so doing, in the exercise of such care as an ordinarily careful and prudent man would exercise under the circumstances, and thereby the deceased was shot and killed, such killing would be manslaughter.

(8) Unless you find from the evidence beyond a reasonable doubt that defendant's use of said gun at the time of the shooting was negligent and reckless, you should acquit him.

(9) If you find from the evidence beyond a reasonable doubt that the defendant negligently, carelessly, and recklessly, discharged the gun in question and thereby shot and killed the deceased, then the fact, if it be a fact, that the deceased moved or raised his head at the time or just prior to the firing of the shot, and that such act contributed to his death, if it did, would constitute no defense.

(11) Negligence is the lack of such care as an ordinarily careful man would exercise under like circumstances. It is a relative term, and whether or not an act is negligent depends upon all the circumstances and conditions surrounding and attending the act. In determining whether or not the defendant was negligent in his use of the gun in question, you should consider all the facts and circumstances surrounding him at the time: where he aimed or pointed the gun, and how close to the deceased the same was aimed or pointed; whether, to his knowledge, the deceased was aware that he was about to discharge the gun; whether he should, in the exercise of ordinary care, have anticipated that deceased might move or come in range of said gun; his skill or lack of skill with firearms; the character of the gun in question as known to him, and the familiarity of defendant with said gun or his lack of it; his condition as to intoxication or

otherwise, and any and all other facts and circumstances in evidence that may aid you in determining the question, bearing in mind that he was bound to exercise such degree of care as an ordinarily careful and prudent man would exercise in like circumstnaces, and no more.

In opposition to these, defendant asked the following:

No. 1.  If you find at the time the defendant, when he fired the shot in question, was shooting at a mark and not intending or anticipating injury to the deceased, or to any one else, before you can find him guilty as charged, you must find that he was grossly negligent; that is, that he was guilty of gross negligence. And you are instructed that by the term 'gross negligence' is meant the failure to exercise slight care.

No. 3.  You are instructed that by the term 'gross negligence' is meant such absence of care as to evince or indicate that there was an indifference to the consequences or the rights of others.

No. 7.  And you are further instructed that by the term 'gross negligence' is meant the want of slight diligence, or, what is the same, the want of that care which every man of common sense, however, inattentive, takes of his own property; that is, by the term 'gross negligence' is meant exceeding negligence.

Considerable difficulty has been experienced by the courts in stating rules with reference to homicide growing out of the negligent use of dangerous weapons. And there has also been much difficulty in the use of the terms "slight," "ordinary," and "gross" negligence. Some courts have entirely abandoned the use thereof and made each case to depend upon its peculiar circumstances. Whether or not a given act is careless and reckless depends primarily upon the circumstances and is always a question for the jury, and yet there must be some guide whereby to determine whether the act is criminal or merely a misadventure for which there may be civil liability. If at the time defendant was guilty of some act *malum in se* from which death results, he is guilty of manslaughter as a

matter of course, and some have gone to the extent of applying the same rule if the act be *malum prohibitum.* But others have held the rule to apply if the act is a misdemeanor prohibited by statute or ordinance. We need not stop here to say what the rule should be for this state, for the case was not submitted upon that theory. The state relied upon the rule applicable to the negligent use of deadly or dangerous weapons without reference to statutory or other prohibitions, and the court adopted that theory of the case. From this angle we do not have to consider whether defendant's act amounted to an assault for the consequences of which he should be held responsible, but rather whether or not the court correctly laid down the law with reference to the negligent use of a deadly weapon. Involuntary manslaughter may be committed in many ways, and the law is so solicitous of human life that it considers as unlawful all acts which are dangerous to the person against whom they are directed, and not justified by the occasion, no matter how innocently they may have been performed. A distinction is here drawn between the use of a deadly and dangerous weapon and other careless and negligent acts not necessarily involving life or bodily harm.

In *State v. Benham,* 23 Iowa, 154, we said (opinion by Dillon, J.) :

If the jury should believe that the defendant discharged the gun intentionally, the above sufficiently refers to the legal principles upon which the plea of self-defense must rest. But, suppose the jury shall believe that the gun was not intentionally discharged by the defendant, what is then the law of the case? It is this: Accidental death, wholly to be excused from all guilt, must be caused in the doing of some lawful act. The law, in its solicitous regard for human life, requires all reasonable and due caution in the use of dangerous articles or instruments. If one in doing a lawful act without any intention of bodily harm, and using proper precaution to prevent dan-

ger, unfortunately happens to kill another, the law excuses the killing. Fost. 258; 1 East, P. C. chapter 5, section 40, page 266; Id., chapter 5, sections 8, 36; 1 Russell on Crimes, 657, 658; Whart. Cr. L. (2d Ed.) 382, 385. If therefore the defendant pointed a loaded gun at the deceased, under circumstances which would not have justified him in shooting the deceased, and the deceased seized it and struggled for it to save himself from the menaced injury from it, and in the struggle it went off without being purposely shot off by the defendant, the latter could not claim that the homicide was excusable. It would be manslaughter; and the circumstances relied on wholly to excuse the defendant would be regarded by the court in fixing the amount of punishment. The converse of the last proposition would, of course, be true, viz., that if the defendant pointed a loaded gun at the deceased and 'it went off,' under circumstances in which it would have been lawful to have shot it off, the defendant would be regarded by the laws as being guilty of no offense.

Again, in *State v. Vance,* 17 Iowa, 138, Wright, J., speaking for the court, said:

If one fires a gun recklessly or heedlessly, he will not be excused; and his offense will be at least manslaughter, though the weapon was pointed in the range of the deceased by accident, with no design or intention to wound or kill. If the act is attended with probable mortally dangerous consequences to the deceased, or persons generally, and death should ensue, the crime is murder or manslaughter, depending upon the degree of deliberation. The law always presumes that a party intended the probable and natural effect of his deliberate act; and when, therefore, the killing is deliberate, malice is presumed, and the crime is murder, unless sufficient excuse or provocation is shown. A homicide (amounting to murder or manslaughter, according to circumstances) may be committed, in opposing even an unlawful effort to carry away property. The owner may resist the taking, but not to the taking of life. And, as a party could not, in any emergency, lawfully employ a deadly weapon for such purpose, neither could he, it would seem, use it in the

form of a threat, as to frighten or drive away those committing the waste. It is certainly sure that if death should ensue from the carelessness of the party, in thus attempting to frighten the depredator, he would not be excused, though he had no intention of wounding or killing any one. We remark, in conclusion, in this part of the case, that a person, in the commission of a crime, may determine to do the wrong, or act with such indifference as almost, if not quite, 'supply the place of the more positive mental condition.' Applying this proposition, thus briefly stated, to cases of homicide, and the rule is that every act of gross carelessness, even in the performance of what is lawful, and *a fortiori* of what is not lawful, and every negligent omission of a legal duty, whereby death ensues, is indictable either as murder or manslaughter. *Rex v. Carr,* 8 C. & Payne, 163; 2 Archb. 9; *U. S. v. Freeman,* 4 Mason, 505 (Fed. Cas. No. 15,-162). In the light of these principles, we need no more than say that the first instruction asked by defendant was properly refused. For, according to that, to constitute the offense (of manslaughter), the killing must have been the result of an intentional, unlawful purpose or act, against the deceased or some other person.

Again, in *State v. Hardie,* 47 Iowa, 647, we said:

The court instructed the jury as follows: '(5) And on the charge of manslaughter, I instruct you that if the defendant used a dangerous and deadly weapon, in a careless and reckless manner, by reason of which instrument so used he killed the deceased, then he is guilty of manslaughter, although no harm was in fact intended.' Other instructions of like import were given, and the question of criminal carelessness was submitted to the jury, as follows: '(8) And in this case I submit to you to find the facts of recklessness and carelessness under the evidence, and if you find that the death of the party was occasioned through recklessness and carelessness of the defendant, then you should convict him, and if not you should acquit. And by this I do not mean that defendant is to be held to the highest degree of care and prudence in handling a dangerous and deadly weapon, but only such care as a reasonably prudent man should and ought to use under like cir-

cumstances, and if he did not use such care he should be convicted, otherwise he should be acquitted.' There can be no doubt that the instructions given by the court embody the correct rule as to criminal carelessness in the use of a deadly weapon. Counsel for defendant insist that the instructions of the court do not go far enough, and upon the trial asked that the court give to the jury the following instructions: '3. Although the deceased came to her death from the discharge of a pistol in the hands of the defendant, yet if the defendant had good reason to believe, and did believe, that the pistol which caused her death was not in any manner dangerous, but was entirely harmless, and if he did nothing more than a man of ordinary prudence and caution might have done under like circumstances, then the jury should find him not criminally liable and should acquit.' This instruction and others of like import were refused by the court, and we think the ruling was correct. That the revolver was in fact a deadly weapon is conclusively shown by the terrible tragedy consequent upon defendant's act in firing it off. If it had been in fact unloaded, no homicide would have resulted, but that defendant would have been justly censurable for a most reckless and imprudent act in frightening a woman by pretending that it was loaded, and that he was about to discharge it at her. No jury would be warranted in finding that men of ordinary prudence so conduct themselves. On the contrary, such conduct is grossly reckless and reprehensible, and without palliation or excuse. Human life is not to be sported with by the use of firearms, even though the person using them may have good reason to believe that the weapon used is not loaded, or that, being loaded, it will do no injury. When persons engage in such reckless sport, they should be held liable for the consequences of their acts. (See, also, *State v. Tippet,* 94 Iowa, 646; *State v. Moore,* 129 Iowa, 514).

In view of the testimony as to the use of the weapon, we think the instructions given by the trial court were correct, and that there was no error in refusing defendant's request. In other words, it was not necessary for the state to show that the defendant was guilty of gross

negligence in the use of the weapon. Perhaps it would be as well to say that the use of a deadly and dangerous weapon in a careless and reckless manner is such gross negligence as makes the act criminal. Without referring to authorities from other states, it is sufficient to say that the opinions from which we have quoted seem to sustain the instructions given.

III. The last instruction of which complaint is made is very like the one considered in *Armstrong v. James,* 155 Iowa, 562, and need not be set out in full. It is not so strong as the one given in that case and in many of the others cited in that opinion. Following the rule of those cases, we conclude there was no error here.

Finding no reversible error, the judgment must be, and it is—*Affirmed.*