79 So.2d 673 (1955)
Russell G. TONGAY, Appellant,
v.
The STATE of Florida, Appellee.
Supreme Court of Florida. Special Division A.
April 6, 1955.
Rehearing Denied May 9, 1955.
Jepeway & Dauber, Miami, for appellant.
Richard W. Ervin, Atty. Gen., Bart L. Cohen, Asst. Atty. Gen., and John D. Marsh, County Sol., for appellee.
TERRELL, Justice.
Appellant was tried and convicted of manslaughter in the Criminal Court of Record, Dade County, on an information charging that "by his own * * * culpable negligence and with * * * reckless disregard for the life and safety of one Kathy Tongay, the infant daughter of the said Russell G. Tongay, age five years and eleven months, * * * command and permit said minor child, * * * to perform an act imminently and inherently dangerous * * * to wit: to jump or dive from a high tower into a pool of water, whereby, *674 * * * the said Kathy Tongay struck the water * * * with great force, causing her, * * * to suffer * * * mortal injuries, * * * from which * * * [she] did die." He was sentenced to serve a term of ten years in the state penitentiary and a new trial having been denied, he seeks relief from the judgment imposed on him by appeal.
The first question presented is whether or not the facts alleged in the information and the evidence adduced to support them are sufficient to sustain a conviction of manslaughter.
It is admitted that Kathy Tongay was five years, eleven months old, that her father had been training her to be an expert diver and swimmer, that she was diving from a ten meter (33 1/3 feet high) platform and that the cause of her death was generalized peritonitis induced by traumatic rupture of the small intestine. Appellant contends that there is a complete dearth of showing that he commanded Kathy Tongay to dive from said tower, that there is serious doubt that the dive caused the injury from which she died, that the results of the dive could not have been reasonably foreseen, that she had repeatedly dived from said tower at other times, that she had acquired great skill as a high diver and being so, appellant was warranted in permitting her to continue high diving and should not be charged with culpable negligence amounting to manslaughter as contemplated by Section 782.07, F.S.A., as follows:
"782.07 Manslaughter.  The killing of a human being by the act, procurement or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder, according to the provisions of this chapter, shall be deemed manslaughter, and shall be punished by imprisonment in the state prison not exceeding twenty years, or imprisonment in the county jail not exceeding one year, or by fine not exceeding five thousand dollars."
Culpable negligence as employed in said statute has been defined as negligence of a gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or in case there is such want of care as would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness or a grossly careless disregard of the safety and welfare of the public or reckless indifference to the rights of others. Cornell v. State, 159 Fla. 687, 32 So.2d 610, 612; Cannon v. State, 91 Fla. 214, 107 So. 360, 363; Russ v. State, 140 Fla. 217, 191 So. 296.
Did the act of permitting or commanding his small daughter to dive from a ten meter tower into a swimming pool amount to culpable negligence as contemplated by the quoted statute and the last cited decisions? The answer to this question turns on the resulting consequences and the interpretation of the evidence in support of the charge against appellant. It is shown that on the day after the child's death, appellant told one of the detectives that he carried her to the pool May 6, 1953, when she performed three dives from the tower and that one of them was bad, "she fell flat on the front face" and complained of pain in the neck and stomach. Later the same day appellant said she complained of pain in the neck and stomach after swimming and cating. She continued to complain and a doctor was called later in the afternoon who ordered Kathy Tongay to the hospital but she died before the doctor got there.
At another time, appellant told the detective that Kathy made a bad dive on the previous Monday, two days prior to her death. He gave the doctor the same information at the hospital the day Kathy died. The lifeguard at the pool testified that he saw appellant and Kathy at the pool early the day she died and noticed that she was sick, did very little swimming, had bruises over her body and vomited when she took food. Paul McDonald, a diving and swimming instructor for twenty years, testified that he saw Kathy at the pool eight of the eleven days enumerated in the information; that he last saw her diving from the ten meter platform May 3, three days before her death; that he never saw her enter the *675 water perfectly; that the impact when she struck the water sounded like a small firecracker.
Mariland McDonald, assistant to her husband, Paul McDonald, testified that she had observed Kathy with appellant over a period of four years; that she last saw her dive from the ten meter diving tower May 3; that appellant ordered her to dive from the tower; that she cried and did not want to dive but the appellant said "go" and she went. She said she saw Kathy crying two or three times as she was ascending the tower and saw her come up one time screaming.
Gustaf Peterson, a guest at the hotel adjacent to the diving tower, testified that on the morning of May 6, the day Kathy died, he saw her execute two or three dives from the tower and some underwater swimming and that as "she surfaced, she let out a yell and defendant jumped in the pool and they both got out of the pool and left." Peterson further testified that he saw her dive from the ten meter tower at times when she would enter the water with a big splash which was not a proper dive, at other times she would wait on top of the tower as much as five minutes before going off; that her brother would at times go up and spend the time with her before she went off; she would whimper at times as she was going to the tower.
Pete DesJardins, a swimming and diving instructor, a double Olympic Diving Champion and winner of eleven national diving championships, testified that he had specialized in springboard and high level diving for 30 years; that he knew Kathy and appellant and was familiar with the ten meter tower in question and had used it many times. He further testified that the average dive from a ten foot springboard takes a fair amount of skill, that the higher one dives, the more skillful one should be because of the increased speed. (It was shown that Kathy's body would be traveling approximately 43 feet per second at the time she struck the water when executing a dive from the ten meter tower.) DesJardins testified that one diving from greater height required more balance to land right; that appellant had not the qualification or the experience to teach advanced diving, that it would be very unsafe to permit Kathy to execute a two-and-a-half dive (two-and-a-half somersaults) from a ten meter tower because of lack of experience, strength and control of the body to execute a dive from that height. He further testified that a one-and-a-half lay-out dive did not take as much power but that it required more skill and that a lay-out from the back requires excellent skill. He also testified that it took years of experience to develop the muscular coordination essential to high diving.
Earl Clark, who had been engaged in diving 22 years as an amateur, won nine national championships from ten meter towers, turned professional in 1941, and experienced in instructing children to swim and dive, in answer to a hypothetical question as to whether or not a child of Kathy's age, considered an excellent diver, would have the necessary physical strength and muscular coordination to execute a two-and-a-half dive from a ten meter tower, answered that she would not because her body development was insufficient to withstand the shock from striking the water at that height. In such an advanced dive, said Clark, the timing and coordination has to be acquired by experience and cannot be acquired in a few months by a child of her age. A child of her age is not capable of developing the timing and muscular coordination required to execute a two-and-a-half somersault dive from a ten meter tower safely. In response to inquiry about bruises on Kathy's body, Clark testified that he had had blisters on top of his feet and legs from diving, larger than a half-dollar, some of which would disappear in an hour while others would linger a week.
Account of this being a case of first impression here and there being a dearth of such cases in the country, I have reviewed the evidence at some length, touching only the high points. I do not overlook the fact that there are conflicts but from the evidence as a whole the jury were warranted in assuming that diving from a ten meter *676 (33 1/3 feet) tower was an extremely hazardous venture for a child of Kathy's age. Children of her age do not possess the experience, physical strength, muscular coordination, skill and bodily control or high diving know-how to negotiate this kind of diving. Appellant knew or should have known this and should not have permitted his zeal or obsession to make a high diver of his immature child to cause him to lose or forget all sense of the hazard and danger incurred in doing so. Under such circumstances, we must decline to hold that the jury missed the mark in finding that appellant's conduct in the treatment of his child evidenced a reckless disregard of its safety in exposing it to such dangerous consequences. In United States v. Freeman, 25 F.Cas. page 1208, No. 15,162, 4 Mason 505, a case similar in some aspects to this, the court called attention to some of the dangers implicit in this case.
As to whether or not the state proved, to the exclusion of every reasonable doubt, that the injury incurred by diving from the ten meter tower was the cause of death, we proceed on the premise that it is not disputed that Kathy died from generalized peritonitis induced by a traumatic rupture of the intestine. Dr. Calderon, the pathologist who performed the autopsy on Kathy, Dr. Sheppard who assisted with the autopsy and Dr. Patterson, a pathologist, testified that the injury could have been caused by a blow from the fist, from a rock, from a kick or from striking the water when diving from a ten meter tower. There is no evidence or suggestion that the injury was caused by a blow from the fist, from a rock or from a kick. Dr. Robert Perpete, a pathologist and witness for the defense, testified that on account of the size of the tear in the small intestine, with other skin lesions, the trauma must have been from other causes than a dive, but that a knowledge of how the body struck the water might make a difference in his opinion. In view of the showing that the trauma which caused the rupture of the intestine and the consequent death of Kathy resulted from a dive or dives from the ten meter tower, it was the duty of appellant to come forward with evidence to show that it resulted from some other cause. Hopper v. State, Fla., 54 So.2d 165, 166; Bellamy v. State, 56 Fla. 43, 47 So. 868; Edwards v. State, 39 Fla. 753, 23 So. 537. Appellant attempted no such showing but on the other hand it may be assumed from what he told Dr. Ramsey and Detective Sapp that Kathy's death resulted from a "bad dive".
This brings us to the concluding question. Did the trial court commit error by admitting in evidence the testimony of the diving experts?
The rule is well settled that expert witnesses may be permitted to testify to facts known to them account of their expert knowledge. This is true even though the testimony may point to an inference or the ultimate fact to be determined. Admission vel non of expert evidence depends on whether or not such evidence has to do with matters which are not those of common knowledge and will be of aid to the jury or the court. If either is true, it should be admitted even though it involve ultimate facts to be decided by the jury. It is the function of the jury to determine ultimate facts and if the expert witness should be permitted to testify to primary facts within his knowledge, he should not be permitted to venture his opinions. Eastern Transportation Line v. Hope, 95 U.S. 297, 24 L.Ed. 477; Ekblom v. G.O. Reed, Inc., 5 Cir., 71 F.2d 399; United States Smelting Co. v. Parry, 8 Cir., 166 F. 407, 410; Cropper v. Titanium Pigment Co., 8 Cir., 47 F.2d 1038, 78 A.L.R. 737.
The judgment appealed from must be and is hereby affirmed.
Affirmed.
MATHEWS, C.J., SEBRING, J., and KANNER, Associate Justice, concur.