Nathan E. Sobel, J.
This case was tried without a jury. The defendants were charged with manslaughter in the second degree, committed without a design to effect death, by culpable negligence. (Penal Law, § 1052, subd. 3.)
The defendants are officers and employees of contractors engaged in the construction of the Brooklyn-Queens Expressway. Six children were killed as a result of a cave-in during excavation work on the project.

The Facts.

The project area can best be visualized as a triangle. The base of the triangle was at street level. Its two sides were Marcy Avenue and Grand Street Extension. The floor of the triangle sloped gradually from its base reaching a depth of about 18 feet at its apex, the corner of Marcy Avenue and Grand Street. Thus the sides of the triangle Marcy Avenue and Grand Street had embankments which progressively grew higher until they reached a height of 18 feet where these streets met at its apex.
The neighborhood was densely populated with 16,000 people occupying 141 apartment buildings in the 36-block area surrounding the construction site.
From the very beginning children used the project area of about a block and a half as a playground. Construction was commenced on May 17, 1956. The accident took place on June 12,1956. As the excavation work progressed, the embankments became deeper and deeper and the danger to the children increased.
There is testimony that they played in parts of the area during working hours although they were continuously chased by the workers. After working hours they played until nightfall. The contractors had complained to the police. Police were detailed to give the area special attention. The police continuously chased the children from the area. The principal of the school adjoining the site repeatedly warned the children at assembly to stay off the area. He personally ordered them off the site on several occasions.
A watchman was employed to set up lanterns for the protection of traffic, but no watchman was employed to keep the children from the area. I find that a watchman was reasonably necessary but neither the State contract nor any law or regulation imposed any duty on the contractor to employ one.
*222 Barricades were erected on both sides of the embankments. Barricades were omitted only at street level points to permit entrance and egress of trucks and equipment. About 70% of the circumference at all points of hazard were protected. I find that the contractors fully and adequately met its obligations in that respect.
The excavation was completed on Friday, June 8, 1956. But on Monday, June 11, 1956, the engineers of Horn, the main contractor, decided to cut four feet deeper into the west embankment. The defendant, Pedone, a foreman for Horn advised defendant, G-arifo, foreman for the subcontractor Service Excavators Inc., of the decision. Pedone gave instructions to the steam shovel operator, Schmitt. Schmitt cut the additional four feet under the direction of Pedone.
The point where the additional cut was made was substantially the area of the cave-in. The embankment stood undisturbed from 2:30 p.m. on Monday, June 11 to 6:30 p.m. on June 12, the approximate time of the cave-in.
On that day the police officer specially assigned to that post chased the children at 4:30 p.m. and again at 5:45 p.m. At those times the children were not playing near the landslide area. Indeed the testimony of all the surviving children was that they never played in that area before and that they never before dug tunnels in any of the embankments.
What occurred before the landslide is not too clear. The testimony of the children is conflicting. We can determine that after they were chased by the police officer at 5:45 p.m., some of them returned to the area of the west embankment along Marcy Avenue. They commenced to dig tunnels. The most intelligent of the children estimates that 10 children were doing the digging about one foot above the toe of the embankment. Some were on their knees; some were lying on their face partly in and partly out of the tunnel. He states that there were several tunnels being dug at the same time. The children were using sticks and hands. The depth of the tunnel was variously estimated at between 10 and 24 inches. A witness states that as some of the children were digging, two of the children were on top of the embankment jumping and with their heels kicking down gravel on the children below. The survivors heard a noise and started to run. A part of the embankment caved in and buried six of the children. The time was estimated at 6:30 p.m.
What is immediately apparent from the detailing of this testimony, is that the case turns entirely on the condition of the embankment at the time of the accident. What was the *223 angle of slope? What was the nature of the soil? Was the embankment at this point left in such an obviously dangerous condition as to charge those who created it with criminal as distinguished from civil responsibility?
The embankment in question was completed at 2:30 p.m. on Monday. It remained stable the balance of that day and during the entire working day of Tuesday while operations were conducted above and around that area. The landslide did not occur until after the children started digging at about 6:00 p.m.
The People attempted to prove that it was obviously dangerous by two kinds of witnesses— (1) those who saw the embankment before the landslide and (2) those who expertly or otherwise attempted to estimate the degree of slope and its dangerous condition from what they observed after the accident.
In evaluating the testimony of both these classes of witnesses, I am considering only that testimony and evidence offered by the People as part of their own case — I am disregarding entirely any evidence offered on behalf of the defendants.
(1) The testimony of those who saw the embankment before the accident is fully detailed in the appendix to this opinion.* The police officer testified it was “steep”, “vertical”, a child could not climb up but he could climb down. He testified that from his observation he did not consider it dangerous. The principal of the school, Mr. Lichtman, testified he was concerned with the danger of the children falling down the embankment but that he did not anticipate or foresee any landslide. The child, Bykow, testified that there was “a hill up”. The child, Carrion, testified that it was a “little slanted”. The child, Mazzoche, testified it was almost straight indicating an angle of 80 degrees. The State inspector Mr. Davis, whose duty it was to inspect the construction daily from a safety as well as progress viewpoint, testified that a child could climb up the embankment with difficulty but could climb down; that the soil was largely hardpan, only the lowest two, three or four feet was sandy. He testified as a People’s witness that he did not consider the angle of slope as dangerous.
The chief witness for the People was the steam shovel operator, Mr. Schmitt. He testified under a grant of immunity for the People. He states he left a toe of about two or three feet deep at the foot of the embankment. He left no overhang. The top part of the embankment was loam; the bottom three or four feet was sand and that he left a slight slope. The slope was “ 50 degrees or 65 degrees ”. “I don’t think you could climb up it *224 but you could slide down without getting hurt.” “ It was quite a slope to it.” But when asked to indicate, by a drawing, the degree of slope he drew a line indicating 80 degrees.
2. The testimony of those who attempted to evaluate the dangerous condition of the embankment from observations made after the landslide is also detailed in the appendix.*
Such testimony has, of course, lesser value. It is quite evident from the exhibits that considerable physical change was made by the firemen, and by equipment used during the rescue work. No witness was called to testify to how this work was conducted and what physical change was made. The People’s experts merely tried to reach a conclusion as to the angle of slope at the point of cave-in by estimating the angle of slope of the embankments to the north and south of the cave-in area.
The People offered as part of their case a survey map prepared by their engineers after the accident. The map showed that the slope of the embankments immediately to the north and south of the cave-in area was 67 degrees. The People’s soil expert, Mr. Reynolds, testified that such a slope with the condition of the soil as he found it was “ statiely safe ” and would “ not be dangerous.” He further testified that the slope could not possibly have been 80 degrees and remained standing. The value of the estimate of the People’s chief witness, the steam shovel operator, Mr. Schmitt, was thus substantially impeached by the People’s expert. The People then called the chief engineer of the State, who demolished witness Schmitt’s testimony by testifying that it is physically impossible to cut a slope as steep as 80 degrees with a steam shovel.
One of the People’s experts, Mr. Salzman, did testify that he observed the surrounding embankments immediately after the accident and that from his observation he did not consider those embankments statiely stable. He testified that even if undisturbed, those embankments would fall in “ a few hours, possibly a day, possibly two days ’ ’. Even if the slope were 67 degrees as indicated on the People’s exhibit, it would in his opinion, still be statiely unstable. He did agree with the testimony of the chief engineer, that a vertical or near vertical cut could not be made by a steam shovel.
This was the evidence offered by the People to establish the inherently dangerous condition of the embankment. The only substantial evidence that the embankment was unstable was offered by the expert Salzman. As the jury, I may accept or reject that testimony. I choose to reject it because the undisputed evidence of Mr. Ritz, the chief inspector for the *225 State Department of Public Works called by the defense was that the very embankment which the witness, Salzman, testified was unstable remained undisturbed and standing for seven months after the accident while the construction work was completed. The witness, Ritz, testified before the Grand Jury as a People’s witness but was not called by them at the trial.
It was also the duty and burden of the People in a criminal case to connect each of the defendants with the commission of the crime. When the crime is one of omission or culpable negligence the evidence should establish that the defendants aided and abetted in the creation of the dangerous condition or at the very least had knowledge thereof. The evidence establishes that the defendant, Pedone, did direct the digging of the embankment in question. It establishes that one of the defendants, Schlam, saiv the embankment after the work was completed, but none that he ever gave any orders or instructions in connection therewith. With respect to the defendant, Garifo, the only proof offered is that he is an officer of the subcontractor Service Excavators, but he never saw the embankment during or after the work progressed. With respect to defendants Joseph and D ’Aquilla, the only evidence offered was that they were officers respectively of the contractor and subcontractor. There was no attempt to establish their duties and responsibilities as such officers; and no evidence that they ever knew of the existence of the embankment or ever personally appeared on the construction job at any time. The People with respect to these defendants, rely on some theory of vicarious criminal responsibility never made evident to me during the course of the trial.
The Law — Theory of People’s Case.
1. Civil liability of occupiers of land to trespassers.
The children in this case were intruders and trespassers. By no means may they be considered “ constructive ” invitees as in Le Roux v. State of New York (307 N. Y. 397). They were neither permitted nor tolerated on the land. They were repeatedly chased and repeatedly warned to stay off the land. (Restatement, Torts, § 329; Carbone v. Mackchil Realty Corp., 296 N. Y. 154.)
No principle is better established in the law of negligence, than that the acts or omissions of one person followed by injury to another do not alone give rise to civil liability for damages. Unless the conduct is willful, it must constitute negligence. The legal concept of negligence involves a violation of some duty owed to the person injured or to a class to which he belongs. And, such duty when not specifically imposed by statute, is not *226 to guard against all possible consequences but only against those which may be reasonably anticipated or which are reasonably foreseeable. (Palsgraf v. Long Is. R. R. Co., 248 N. Y. 339; Williams v. State of New York, 308 N. Y. 548; Staruck v. County of Otsego, 285 App. Div. 476; Trent v. City of New York, 286 App. Div. 479; Rasmussen v. Palmer, 134 F. 2d 780; Lynghaug v. Payte, 247 Minn. 186.)
As a general rule, however, an occupier of land (as were the contractors in this case) owes no duty to trespassers to keep his land in reasonably safe condition or to conduct his normal activities so as not to injure them.
The theory is that since the occupier has the right to fix the terms and conditions upon which any one may enter his land, those who trespass without his permission have no right to expect him to safeguard them in their unlawful conduct. (Morse v. Buffalo Tank Corp., 280 N. Y. 110; Mendelowitz v. Neisner, 258 N. Y. 181; Fox v. Warner-Quinlan Asphalt Co., 204 N. Y. 240; Birch v. City of New York, 190 N. Y. 397.)
> That general rule is based on sound public policy. It would be an obviously unreasonable burden to require owners of property to keep the whole of their premises in such condition as to make every part of it safe for those who have no right to enter. The broad range of such a duty, the impossibility of forecasting how the trespasser may enter or where he may go or what he will do, all clearly preclude the idea that the law can require such a serious restriction on the owners use of his own land or justify the imposition of a heavy burden of expense to prevent some vague risk or some improbable injury to trespassers. So the law is that owners owe trespassers no duty of even reasonable or ordinary care. (Restatement, Torts, § 333.) That is the general rule.
But recently, policy considerations, rather than sound principles of negligence law, have influenced our courts to permit infant trespassers to recover from owners under circumstances where ordinarily there would be no liability to adults. It would serve little purpose to review these infant exception cases at length. The cases must be briefly considered however, since the People in this case seek to charge the defendants with a serious crime, manslaughter by culpable negligence, for conduct for which most jurisdictions do not now, and New York only a few years ago, refused to permit even civil damages for ordinary negligence.
Kingsland v. Erie County Agric. Soc. (298 N. Y. 409) involved maintenance of explosives, an inherently dangerous instrumentality on the land. French v. Central N, Y. Power Co. (275 App. *227 Div. 238 [1949]) (dismissal of complaint before trial) involved high voltage electrical apparatus which was left unprotected. Runkel v. City of New York (282 App. Div. 173 [1953]) involved the collapse of an abandoned building which had been condemned and ordered torn down a year before the accident; the owners were committing a misdemeanor in maintaining the property. All of these cases involved instrumentalities dangerous per se as distinguished from an embankment which is dangerous only under certain conditions.
The indictment is predicated on the recent decision of Mayer v. Temple Properties (307 N. T. 559 [1954], affg. 283 App. Div. 786, by four-to-two vote). Indeed it follows the language used by the court with precision. The child killed was a trespasser. The property was in a congested neighborhood. Defendant had knowledge that children played there and on occasion chased them. The child fell through a hoistway, 55 feet deep which was covered with flimsy wood.
The court said (p. 563): “ Here we have a dangerous instrumentality in the nature of a perilous trap affirmatively created by defendants by knowingly placing over a hole 55 feet deep * * * a frail wooden covering that could not sustain the weight of this twelve-year-old boy. Moreover, this utterly insecure covering gave a deceptive appearance of safety, was pregnant with hazard, and the direct consequences were clearly foreseeable.”
There are many differences between the Mayer case and the case at issue. (1) The hoistway in Mayer was an abandoned coal bin. It had no present utility. Subdivision (d) of section 339 of Restatement of Torts states, as one of the conditions for liability, “ the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein”. (See, also, Restatement, Torts, explanatory n, p. 925.) (2) Need I point out also that in Mayer, the child did not contribute to the risk whereas in the instant case all the experts agree that the digging “ caused ” or “ triggered ” the landslide. (See cases discussed in Ann. 28 A. L. R. 2d 202.) (3) Also the danger in the Mayer case was not obvious. The flimsy covering gave a deceptive appearance of safety. The danger from an embankment is obvious even to young children. The rule is well stated in section 86 of volume 20 of Ruling Case Law as follows:
1 ‘ Like waters, pits and excavations on land embody no dangers that are not readily apparent to everyone, even very young children. For this reason the proprietor is under no obligation, as a rule, to fence or otherwise guard such places, and *228 he will not be liable for injuries to children who may have fallen therein. Nor is the landowner liable for injuries sustained by earth falling into excavations as a result of the embankment being undermined by children.” (Italics supplied.)
Also in Restatement of Torts (p. 925): “ This does not require him to keep his land free from conditions which even young children are likely to observe and the full extent of the risk involved in which they are likely to realize. The purpose of the duty is to protect children from dangers which they are unlikely to appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known danger.”
The overwhelming majority of cases, early and recent, support this view. (Newdoll v. Young, 80 Hun 364; Van Buren v. Town of Bethlehem, 178 App. Div. 254; Puckett v. City of Louisville, 273 Ky. 349; Anderson v. Reith-Riley Constr. Co., 112 Ind. App. 170; Plante v. Lorraine Mfg. Co., 82 A 2d 893 [R. I.]; and, see, Ann. 28 A. L. R. 2d 190, 206-210.)
I make clear that it is not my purpose to determine whether or not ordinary negligence can be proved in this case. I discuss the cases to establish the nebulous nature of the liability for ordinary negligence in order to point up the nature and degree of proof required under our criminal law to establish culpable or criminal negligence. I emphasize that the same standards, as distinguished from degree of proof, are applicable to both “ ordinary ” and “ culpable ” negligence. Thus in determining criminal liability for culpable negligence the court must consider that the children were trespassers, that embankments are not per se dangerous Instrumentalities and that embankments do not present a “ deceptive appearance of safety ”.
2. Civil v. Criminal Responsibility of Agents.
There is room for dispute as to whether or not the contractor corporations are civilly liable for negligence. But note that in this case there is no attempt to hold the corporations criminally responsible. On the contrary indictments have been found against their agents and officers.
I need not dwell on principles of law which are so obvious. “A master is subject to liability for injuries caused by the (tortious or) negligent conduct of his servants within the scope of their employment.” (Restatement, Agency, §§ 219, 243.) Under this principle the contractors could be liable to persons killed or injured. “ An agent is subject to liability if, by his acts, he creates an unreasonable risk of harm to the interests of others protected against negligent invasion”. (Restatement, *229 Agency, § 350.) (Italics supplied.) Under this provisión, defendant Pedone could under certain circumstances be civilly liable. “ The agent * * * is not subject to liability for the conduct of other agents unless he assists them in the performance of a tortious act or directs or permits them to commit it V. (Restatement, Agency, § 358.)
The doctrine of respondeat superior does not apply to create liability against an agent even though other agents are subject to his orders. He is responsible only if he himself directs, commits or permits the dangerous conduct.
The defendants in this case are all agents of the employers, Horn and Service. The defendants, Joseph, D ’Aquila and Garifo never saw the embankment, the alleged dangerous instrumentality. There is no proof that they had knowledge of its existence. There is no proof that they assisted, directed or permitted it. The defendant, Sehlam, saw the embankment after it was completed. There is no proof that he directed or assisted in its creation and insufficient proof that he permitted it. Thus on elementary principles of agency, these defendants could not be held even civilly liable for damages. There would be a question of fact in a civil case whether or not defendant, Pedone, could be liable on principles of agency.
Criminal responsibility of employers and agents for the crimes of subordinate agents is quite a different matter. The doctrine of respondeat superior (except in certain regulatory offenses) does not apply in criminal cases. (See Sayre, Criminal Responsibility, 43 Harv. Law Rev. 689, 694; United States v. Kemble, 198 F. 2d 889, cert, denied 344 U. S. 893; State v. Pinto, 129 N. J. L. 255.)
The sole test of criminal responsibility is found in the definition of “ principal ” (Penal Law, § 2): “ Principal. A person concerned in the commission of a crime, whether he directly commits the act constituting the offense or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime, is a ‘ principal ’.”
Thus in order for an employer or an agent criminally to be liable for the acts of another agent, it must appear that he knowingly aided, abetted, counseled, commanded, induced or procured the agent to commit the crime.
This definition presents no difficulty in ordinary crimes of commission. It presents little difficulty in “ unlawful act manslaughter” (Penal Law, § 1050, subd. 1). It presents great difficulty in its application in ‘1 lawful act ’ ’ manslaughter (Penal *230 Law, § 1052, subd. 3), i.e., homicides committed in the performance of a lawful act but in a culpably negligent manner. May one who prior to the commission of the crime aids or directs the doing of the lawful act in a culpably negligent manner be an accomplice 1 I can envision circumstances where such a person would be criminally responsible. But I am certain that one who aids, abets, directs or procures another to commit a perfectly lawful act, which that agent performs in a culpably negligent manner resulting in death, is not an accomplice in the commission of the crime. (State v. McVay, 47 R. I. 292.)
The American Law Institute in preparing its “ Model Penal Code ” experienced some difficulty in writing a definition of an accomplice in crimes resulting from ordinary negligence or culpable negligence in the performance of lawful acts. The following was suggested (First draft, p. 12): “ When causing a particular result [death from culpable negligence] is an element of a crime, a person is an accomplice in that crime if: (a) he was an accomplice in behavior [creation of dangerous instrumentality] causing such result; and (b) he shared such purpose or knowledge with respect to such result ’ ’.
The emphasis is, of course, that the accomplice must share in the behavior (the creation of the dangerous condition) which causes the result (death by culpable negligence). The comment at page 34 states: “ One who urges a driver to increase his speed stands in the same position as the driver if a homicide or injury occurs ”. Only defendant, Pedone, “ shared in the behavior ” in the cutting of the embankment. True, defendant, Schlam, saw it after it was completed. He made no protest. But certainly one who permits a driver, to increase his speed without remonstrance, does not share in the behavior of the driver. To so hold would make all of us capable of crime merely by possessing a conscious or unconscious knowledge that a fatal accident would result.
But, of course, the model code provision goes much further than merely requiring an accomplice to share in behavior. The behavior though negligent, may be perfectly lawful. It requires in addition that the accomplice must share in his principal’s purpose and knowledge. In culpable negligence manslaughter, this means that the accomplice like the principal, must have a conscious awareness of the danger involved and must consciously disregard a substantial and unjustifiable risk of death or serious injury to others. (Cf. People v. Eckert, 2 N Y 2d 126.)
From this discussion of basic principles of law, I conclude and find that defendants Joseph, D’Aquila, Garifo and Schlam are not, as a matter of law, accomplices.
*231 The Law — The Nature of Culpable Negligence.
1. The Statute.
Subdivision 3 of section 1052 of the Penal law defines manslaughter in the second degree, as a homicide committed ‘ ‘ without a design to effect death: * * * By any * * * culpable negligence of any person These are the pertinent provisions of the statute. The other provisions of subdivision 3 are designed as a catchall for other kinds of manslaughter.
The crime is of common-law origin. It was known at common law as involuntary homicide by lawful act to distinguish it from involuntary homicide committed in the course of a misdemeanor, trespass or other unlawful act below the grade of misdemeanor. The term “culpable negligence” thus had a well-understood meaning at common law. (People v. Angelo, 246 N. Y. 451; State v. Custer, 129 Kan. 381.)
To trace the statutory development of the crime will serve no purpose. As included in the Revised Statutes of 1829, it was carried forward in the Penal Code of 1881 and the Penal Law of 1909 without substantial change except as to punishment. One thing need be noted. The problem of choosing the degree of negligence which ought to be made the basis of guilt for involuntary manslaughter by lawful act was presented for solution very early in the history of the State. (Draft of Revised Statutes with Revisers Notes, 1827.) The Legislature rejected the test of “ ordinary ” negligence and accepted instead the test of “ culpable ’ negligence. This is discussed in People v. Angelo (supra). In so doing the Legislature accepted the latest developments in common-law jurisdictions and in judicial interpretation of manslaughter statutes.
It is interesting to note in this connection that those few States which accepted the test of “ ordinary ” negligence, i.e., homicide ‘ ‘ in the commission of a lawful act without due care and circumspection ’ * have either by statute or by judicial interpretation substituted the criminal or culpable negligence test. (See People v. Penny, 44 Cal. 2d 861 for history of the California experience.)
2. Distinction between Lawful Act and Unlawful Act Homicides,
The greater the danger, the greater the degree of care required is a principle repeatedly announced in the general law of negligence. Foreseeability, awareness of risk, knowledge, criminal intent, are all elements influenced by the degree of danger attendant upon the actor’s conduct.
At common law, the degree of manslaughter and the punishment therefor were determined by the test of “ apparent danger ”, If there was none, it was the lowest degree of negligent *232 homicide. '■ (Livingston on Criminal Jurisprudence, New York, 1873.)
So in our earliest statutes that principle is recognized. Manslaughter in the course of commission of a misdemeanor was made first degree; in the course of commission of a trespass or other unlawful act not amounting to a misdemeanor, third degree; in the course of commission of a lawful act, fourth degree. (Rev. Stat., 1829, tit. II, art. first.)
Under our present law misdemeanor manslaughter is first degree (Penal Law, § 1050, subd. 1); trespass or other private wrong not amounting to a crime is second degree (Penal Law § 1052, subd. 1); culpable negligence manslaughter is also second, degree (Penal Law, § 1052, subd. 3).
The first two are commonly called 1 ‘ unlawful act ’ ’ homicides; the third “ lawful act ” homicides.
. It requires no lengthy exposition of the law to establish that one who is engaged in the commission of an unlawful act, especially one malum in se, has a greater awareness of risk and the potential danger from Ms acts than one who is engaged in a perfectly lawful act. Any unlawful act involves conscious risk creation. Thus in misdemeanor manslaughter, mere proof of the commission of the requisite underlying misdemeanor, whether malum in se or malum prohibitum, is sufficient to establish the.prima facie case. (People v. Nelson, 309 N. Y. 231.) Proof of violation of any other law, ordinance or code provision is evidence of negligence. (Martin v. Herzog, 228 N. Y. 164; Taggart v. Vogel, 3 NY 2d 58.) But where the charge is lawful act homicide, proof of a much greater degree of negligence, culpable negligence, is required.
If this principle of law has not been expressly stated by our courts, it is manifest by our experience under the involuntary manslaughter statutes. Apart from automobile homicides, I find not one conviction in this State for “ lawful act ” homicide.
This fact is sometimes obscured by the ‘ ‘ overlapping ’ ’ of separate counts for misdemeanor manslaughter and culpable negligence manslaughter. People v. Nelson (supra) is such a case. But in that case the Appellate Division (283 App. Div. 1116) vacated the sentence for culpable negligence manslaughter, which was tantamount to a dismissal of that count (see dissent, People v. Nelson, 309 N. Y. 231, 247, supra).
Thus in People v. Buddensieclc (103 N. Y. 487) (collapse of building) the main charge was negligent use of machinery etc., a separate subdivision of section 1052 (then Penal Code, § 195) requiring only ordinary care and the conviction was based on *233 violations of law. In People v. Polstein (184 App. Div. 260, affd. 226 N. Y. 593) (collapse of building) the court stated (p. 261): “ there were numerous violations of the Building Code
eIn People v. Steinberg (277 N. Y. 728) (collapse of a building) there was no opinion in any court but the District Attorney stated in the record on appeal: 11 They saw the many violations of law which were indulged in.” In People v. Alexander (293 N. Y. 870) (fire), the first count was misdemeanor manslaughter; the second count was also based on violations of law; a count of culpable negligence was withdrawn during trial. In People v. Harris (74 Misc. 353) (Triangle Waist Co. fire) demurrers were disallowed with respect to all counts charging unlawful act manslaughter and allowed as to the one count charging culpable negligence manslaughter. People v. Diamond (95 Misc. 114) (factory fire), demurrer disallowed, was a misdemeanor manslaughter case. In People v. Orzel (263 N. Y. 200) (building collapse) the court reversed a conviction for culpable negligence on technical grounds but stated that some of the members of the court were of the opinion that the trial court should have dismissed the indictment.
As a matter of fact, I find no conviction in any State for any kind of manslaughter arising out of the cave-in of an embankment. This includes those States which have adopted the “ ordinary ” negligence rule.
Automobile homicides represent the great majority of manslaughter cases both in this and other States. Prior to 1936, such homicides were prosecuted as misdemeanor manslaughters or culpable negligence manslaughter or both, with consequent overlapping of proof. Since the enactment of section 1053-a of the Penal Law in 1936, most automobile homicides are prosecuted under that special provision. However, these cases almost without exception, involve “ unlawful act” homicides. Convictions are always dependent on such misdemeanors as reckless driving or driving while intoxicated, or upon the violation of traffic infractions such as speeding etc.
In the instant case, the People have not proved the commission of any unlawful act. They do not contend that any misdemeanor was committed and indeed did not charge the defendants with misdemeanor manslaughter. They attempted to prove a violation of section C26-389.0 of the Administrative Code of City of New York but this is a provision of the building code applicable only to excavations for building purposes. In any event the particular provision, if applicable, was fully and adequately complied with. Further, I find as a matter of fact *234 that the defendants have fully -complied with each -and every requirement -of the State contract -and all the rules and regulations pertinent thereto.
The defendants, therefore, stand charged with -culpable negEgenee manslaughter in committing a lawful act in a culpably negligent manner.
The degree of proof required with respect to each and every element -of the -crime is -much greater than -is -required in an unlawful act homicide. This is true with -respect to proof of knowledge or awareness of risk. It is particularly true with respect to proof of criminal intent.
3. -Criminal intent.
Manslaughter where death results from the -commission .of a misdemeanor is analogous to felony murder ‘(People v. Grieco, 266 N. Y. 48, :53). -‘"Felonious intention, as-am element of the homicide, -is suppEed by the intention -to do the unlawful act of -which ¡the homicide is a consequence. The intent is transferred-by implication-of law.” (26 Am. Jur., Homicide, § 188, pp. 281, 282; 40 C. J. S., Homicide, § 57, pp..920-921.) 'In “ lawful act ’ ’ homicide, there -is no transference of -criminal intent. There canhe no-criminal intent to do a lawful act.
The principle that an injury can only amount to a crime when it is inflicted intentionally is as old as the criminal law itself. Blackstone made the ¡sweeping statement that to constitute -a crime there must first be a vicious will. (4 Blackstone ’s Comm., p. 21.) Thus-it is often stated, that crimes can be committed only from the concurrence of an evil-minding -mind with an- evil-doing hand. (People v. Stuart, 47 Cal. 2d 167.) Legislatures and courts have always been reluctant to impose the soéial condemnation of 'criminal conviction on those who act with-complete moralinnocence.
Eegulatory ¡statutes constitute an ¡exception to this general principle. (People v. D’Antonio, 150 App. Div. 109, 113; Morrisette v. United States, 342 U. S. 246.)
'Unlawful -act homicide is only-an-apparent exception. Most courts require proof of such a degree-of negligence/“culpable ” or'“"criminal'”-or “ gross ”, as is the “ equivalent ”-of criminal intent.
This principle is variously stated in the texts and cases. “ .[TJhere-must be added a reckless and wanton disregard of the rights of others sufficient to -amount to -an intent to inflict the injury ” (People v. Waxman, 232 App. Div. 90, 92).
’“ pl]t -is ordinarily -required -that -‘the negEgence on which involuntary manslaughter may be based must be of a gross or *235 flagrant character, such as would show wantonness or recklessness, or would evince a, reckless disregard of human life or the safety of others, or indifference to consequences, equivalent to criminal intent ”. (40 C. J. S., Homicide, p. 926. ) (Italics supplied.)
“ The phrase ‘ indifference to consequences ’ when used in an instruction defining culpable negligence should clearly inform the jury that what is meant is an indifference under circumstances involving danger to human life — the equivalent to criminal intent * * * and that this shall be so clearly evidenced as to place it beyond every reasonable doubt.” (Smith v. State, 197 Miss. 802, 814, 818-819.) (Italics supplied.)
“ [S]o as to manifest a reckless disregard for the safety of others, then it may be sufficient to supply the wrongful intent essential to criminal homicide ” (Thiede v. State, 106 Neb. 48, 53). (Italics supplied.)
“ [0]r that reckless indifference to the rights of others, which is equivalent to an intentional violation of them.” (Cannon v. State, 91 Fla. 214, 221.) (Italics supplied.)
“It is only from such culpable negligence that a criminal intent may be shown, and in the absence of such criminal intent ^ the crime of manslaughter has not been proved. (State v. Carter, 342 Mo. 439, 441.) (Italics supplied.) jf
I find as a matter of law, that there proof this case of criminal intent or of such culpably reckless conduct which is the equivalent of criminal intent.
4. Knowledge.
Penal Law (§ 3) as do many penal codes of other States, defines the terms “ neglect ” “ negligence ”, “ negligent ” and ‘ ‘ negligently ’ This definition is applicable to minor offenses such as regulatory statutes.
The report of the American Law Institute in adopting a “Model Penal Code,” (Draft 4, p. 128) states: “Rarely, if ever, does this definition serve in itself to measure liability, since the rule of liability ordinarily imports the crucial additional requirement that negligence be ‘ criminal ’ or ‘ culpable ’. Thus under statutes, as at common law, the concept of criminal negligence has been left to judicial definition and the definitions vary greatly in their terms. * * * Much of this confusion is dispelled, in our view, by a clear-cut distinction between recklessness and negligence, in terms of the actor’s awareness of the risk involved.” (Italics supplied.)
The Model Code (Draft 4) defines “ Recklessly ” and “ Negligently ’ ’ as follows:
*236 ‘1A person acts recklessly * * * when he consciously disregards a substantial and unjustifiable risk”. (P.13.)
“A person acts negligently * * * when he should be aware ;of a substantial and unjustifiable risk ”. (P. 13.)
‘ ‘ A broader distinction is perceived between acting either purposely, or knowingly and acting recklessly. As we use the term, recklessness involves conscious risk creation. It resembles acting knowingly in that a state of awareness is involved but the awareness is of risk, that is of probability rather than certainty.” (P. 125.)
“It [acting negligently] is distinguished from acting purr posely, knowingly or recklessly in that it does not involve a state of awareness. It is the case where the actor creates inadvertently a risk of which he ought to be aware ”. (P. 126.)
The model code distinguishes reckless conduct from negligent conduct, in that the former requires a conscious awareness of a risk while the latter involves creation of a risk of which the actor “ ought to be ” aware.
Thus the recklessness requisite in a culpable negligence manslaughter case requires proof of ‘ ‘ knowledge ’7 or conscious awareness of risk. Evidence which tends to prove that the defendant “ should have known 77 is admissible to prove actual knowledge.
"The court in People v. Decina (2 N Y 2d 133,139-140) enunciated this rule, as follows: “ Assuming the truth of the indictment, as we must on a demurrer, this defendant knew he was subject to epileptic attacks and seizures that might strike at any time. He also knew that a moving motor vehicle- uncontrolled on & public highway is a highly dangerous instrumentality capable of unrestrained destruction. With this Jmowledge, and without anyone accompanying him, he deliberately took a chance by making a conscious choice of a course of action, in disregard of the consequences which he knew might follow from his conscious act, and which in this case did ensue. . How can we say as a matter of law that this did not amount to culpable negligence within the meaning of section 1953-a? ”
In addition to knowledge of risk creation there must be conscious disregard' of a substantial and unjustifiable risk, which in terms of the culpable negligence manslaughter statute, means a risk that death or serious bodily injury will probably (as'distinguished from possibly) ensue.
“ [I]t must be shown that a homicide was not improbable' under all the facts existing at the time ”. (5 Am. Jur., Automobiles, p. 927.)
*237 “ [S]uch as would * * * evince a reckless disregard of human life ” (40 C. J. S., Homicide, p. 926).
“ [UJnder such circumstances that it can be said that he consciously realized that his conduct would in all probability (as distinguished from possibly) produce the precise result which it did produce ” (State v. Bates, 65 S. D. 105, 109). “ To be dangerous his conduct must involve a reasonable probability of serious bodily harm or death.” (People v. Eckert, 2 N Y 2d 126, 131.)
“ The facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen. It must appear that" the death was not the result of misadventure, but the natural and probable result of a reckless and culpably negligent act.” (People v. Penny, 44 Cal. 2d 861, 880.)
In determining whether there is proof of conscious risk creation, a distinction must be drawn between unlawful and lawful act homicides. The commission of an unlawful act is evidence of conscious risk creation. The weight of the evidence depends on whether the unlawful act is malum in se or malum prohibitum. But a person engaged in performing a lawful act is ordinarily not conscious of creating a substantial and unjustifiable risk. Ordinarily therefore, a greater degree of proof of conscious risk creation will be necessary.
Another equally obvious distinction exists between use of instrumentalities dangerous per se and those which may become dangerous only under certain conditions. A greater degree of proof of conscious risk creation is necessary in the latter instance. In this connection, I may consider that in this case for at least a working day and a half, the contractors permitted their own employees to work on and about this allegedly dangerous embankment. Such conduct is hardly consistent with conscious awareness or conscious creation of an unreasonable and unjustifiable risk.
I find as a matter of fact that there is insufficient evidence to establish that any of these defendants consciously created or disregarded a substantial and unjustifiable risk.
5. Contributory Negligence.
The victim’s negligence is not a defense to a criminal charge of culpable negligence manslaughter.
But it is the burden of the People to establish beyond a reasonable doubt that the acts or omissions of the defendants were the proximate cause of death. (State v. Phelps, 242 N. C. 540; Commonwealth v. Levin, 184 Pa. Superior Ct. 436.)
*238 Therefore, proof of contributory negligence on the part of the deceased is admissible, but only as a circumstance to be considered in determining whether death was or was not caused as a result of the defendant’s culpably negligent conduct. (State v. Custer, 129 Kan. 381; Ann. 67 A. L. R. 922-931.)
I do not make any findings of fact nor reach any conclusions of law on this issue because of the pendency of civil actions. Such findings or conclusions are not essential to my ultimate determination.
6. The Cases.
The leading case in this State is People v. Angelo (246 N. Y. 451 [1927]). This involves an automobile homicide. The jury found that the car was driven at “ a reckless rate of' speed ’ ’.
In Angelo, the court discussed the history of the “ culpable negligence ’ ’ provision both at common law and in this State. It cites previous Court of Appeals decisions on the issue. The trial court had refused to charge that if the defendant was guilty of only slight negligence he must be acquitted. Referring to this charge, the court said (p. 457): “ ‘ Culpable ’ negligence is therefore something more than the slight negligence necessary to support a civil action for damages. It means, disregard of the consequences which may ensue from the act, and indifference to the rights of others. No clearer definition, applicable to the hundreds of varying circumstances that may arise, can be given. ’ ’
That definition was adequate to cover the issue of law before the court. It has been quoted with approval in People v. Bearden (290 N. Y. 478) and People v. Grogan (260 N. Y. 138). Since Angelo (supra), I count in automobile homicide cases, 15 reversals on the weight of the evidence by appellate courts against 8 affirmances.
In People v. Waxman (232 App. Div. 90, 92 [1st Dept., 1931]) the court said: “ To sustain a criminal prosecution there must be added a reckless and wanton disregard of the rights of others sufficient to amount to an intent to inflict the injury or at least to be indifferent whether the injury happens or not” (Penal Law, § 244, subd. 2).
In People v. Wells (186 Misc. 979, 982 [Sup. Ct., Warren County, 1946]) the court said: ‘ ‘ ‘ Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences may happen to be, do not constitute culpable negligence. There must exist in the mind of the accused at the time of the act or omission, a consciousness *239 of the probable consequences of the act, and a wanton disregard of them.’ ”
The definition of culpable negligence by the courts in other jurisdictions deserves consideration. Manslaughter statutes in most States distinguish between unlawful and lawful act homicides. Ohio does not permit conviction except for unlawful act homicides. (21 Ohio Jur. 70, Homicide, §§ 27, 28.)
Eleven States by statute and all the common-law States by decisional law require proof of “ culpable ” negligence. Other States require proof of “criminal” or “gross” negligence. Some States, notably California have separate statutory standards for automobile and nonautomobile homicides. (For discussion of the various State statutes see 161 A. L. R. 10-66.)
The following are decisions only from those States which by statute require proof of ‘ ‘ culpable ’ ’ negligence.
In Cannon v. State (91 Fla. 214, 221) the court defined culpable negligence as “ a gross and flagrant character, evincing reckless disregard of human life or of the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of [conscious] indifference to consequences ; or which shows such wantonness or recklessness or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them.” (See, also, Tongay v. State, not an automobile case 79 So. 2d 673 [Fla.].)
In Cain v. State (55 Ga. App. 376, 379-380) the court, reversing a conviction for manslaughter, said: ‘ ‘ The degree of negligence to be shown on indictment for manslaughter, where an unintentional killing is established, is something more than is required on the trial of an issue in a civil action. A want of due care, or a failure to observe the rule of a prudent man, which proximately produces an injury, will render one liable for damages in a civil action; but to render one criminally responsible there must be something more, culpable negligence, which under our law is criminal negligence, and is such recklessness or carelessness, resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others and a reasonable foresight that injury would result. * * * We think the words ‘ criminal negligence ’ are synonymous with the words ‘ culpable negligence (See, also, Foy v. State, 40 Ga. App. 617.)
In Hynum v. State (77 So. 2d 313, 314 [Miss.]) the court said: ‘ ‘ In order to maintain the charge, it was incumbent upon the State to prove beyond a reasonable doubt that the appellant *240 was guilty of such gross negligence on the occasion complained of as to evince on his part a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of his act under the surrounding circumstances as to render his conduct tantamount to wilfulness.” (See, also, Smith v. Mississippi, 197 Miss. 802.)
In State v. Carter (342 Mo. 439, 441) the court approved the following instruction: ‘1 The Court instructs the jury that to make negligent conduct culpable negligence or criminal, and to make it manslaughter, if death is caused by it, the particular negligent conduct of the defendant must be of such reckless or wanton character as to indicate on his part an utter indifference to the life of another, who is killed as the result thereof. It is only from such culpable negligence that a criminal intent may be shown, and in the absence of such criminal intent the crime of manslaughter has not been proved.” (See, also, State v. Studebaker, 334 Mo. 471; State v. Melton, 326 Mo. 962.)
The leading English case is the Appeal of Percy Bateman (19 Cr. App. R. 8 [1925]). A conviction of a doctor for culpable negligence was reversed. The Lord Chief Justice, in criticizing a charge which imposed a lesser standard of care, said (pp. 11-12):
“ In explaining to juries the test which they should apply * * * judges have used many epithets such as. ‘ culpable ' criminal ‘ gross ’, ‘ wicked ’, ‘ clear ’, 1 complete ’. But, whatever epithet be used * * * in order to establish criminal liability, the facts must be such that, in the opinion of the jury, the negligence of the accused went beyond a mere matter of compensation between subjects and showed such disregard for the life and safety of others as to amount to a crime against the State and conduct deserving punishment.”
“ It is, nevertheless, most desirable that in trials for manslaughter by negligence it should be impressed on the jury that the issue they have to try is not negligence or no negligence, but felony ór no felony.” (P. 16.)
We see that courts have used the adjectives “culpable”, ligent manslaughter.
These are all accordion words. As stated in Angelo (246 N. Y. 451, supra) the meaning and definition of such words will vary with the hundreds of circumstances involved. Not only will factual circumstances serve to vary their meaning, but legal considerations also will influence their interpretation. For example, I have suggested that a greater degree of proof is *241 necessary to establish culpable negligence in “ lawful ” act manslaughter. Similarly whether or not the instrumentality used is dangerous per se is a legal as well as a factual consideration. And so too, is the consideration of whether or not the alleged culpable negligence involves an act of commission or omission.
The drafters of the Model Penal Code suggest that much of the confusion created by the descriptive adjectives and phrases, commonly used by courts, will be dispelled by the use of the appropriate terms, “ reckless ” “recklessly” or “ recklessness ”. I agree. When the automobile homicide statute (Penal Law, § 1053-a; L. 1936, ch. 733) was recommended by Governor Lehman and adopted by the Legislature, the term “in a reckless or culpably negligent manner ’ ’ was substituted for the term “ culpable negligence ” in the manslaughter statute (Penal Law, § 1052, subd. 3). In the 22 years since that change, no court has suggested that the newer statute changed the degree of proof required.
Recklessness is not defined in the Penal Law or in the penal code of any other State. Such a definition is proposed in the new Wisconsin Code (1953 Reports of Wis. Legis. Council) as appropriate for homicide cases, as follows: “ Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another.” (See 339, 24.)
I am not suggesting legislative redefinition. The use of the term “ reckless ” instead of “ culpable ” will not beg the ultimate question less.
In the last analysis, it is the duty of the court to inform the jury what factors must be considered in arriving at a verdict. The jury should be instructed to weigh the nature and purpose of the defendant’s conduct, the nature and degree of the risk consciously disregarded by the defendant and all the circumstances known to the defendant in acting. The jury will then be required to determine whether or not the defendant was actually and consciously aware of the fact that by his acts or his omissions he was creating a risk; that the risk created was both unreasonable and unjustifiable under all the circumstances established by the evidence; that for a risk to be both unreasonable and unjustifiable it must involve conduct so highly culpable and blameworthy as to be tantamount or equivalent to an intent to injure another; and that the defendant in disregarding such a risk knew or should have known that the probable (as distinguished from possible) consequences of his *242 conduct would result in death or serious injury to another. And, of course, that all this must be established beyond a reasonable doubt.
Such an instruction avoids the difficulty inherent in defining culpability in terms of descriptive adjectives or phrases. Instead, the jury would be required to evaluate the conduct of the defendant and determine whether the conduct should be condemned as criminally wrong. The test would not be negligence or no negligence but crime or no crime.
In the instant case, as the judge of the facts, I need not concern myself with all the elements in the suggested instructions. Proof of the very first element, “ conscious awareness of risk”, is altogether lacking.
As previously found, there is no proof that defendants Garifo, D’Aquila or Joseph ever knew of the existence of the embankment. The defendant, Schlam, saw it but was not concerned by aiding or directing in its construction. There is a total failure of proof that these four defendants were consciously aware of any risk from the embankment.
As previously found, the evidence establishes that defendant, Pedone, directed the construction of the embankment. Embankments are a common and necessary adjunct to any construction job of this nature. They are not dangerous per se. They may become so only because of the manner of construction. But the District Attorney elicited, from his own witnesses, testimony that the embankment was not dangerous. Almost all the People’s witnesses, on either direct or cross, testified that the embankment was not dangerous. How can I say that defendant, Pedone, was consciously aware of a risk to children when there is doubt among the People’s own witnesses as to its dangerous nature ?
This case involves a serious crime, manslaughter. The question of guilt may not be left to surmise. As in any criminal case, guilt must be established beyond a reasonable doubt. I rule that there were no facts or circumstances proved to establish beyond a reasonable doubt that the defendants were consciously aware of any risk to the children from the embankment. I find, therefore, that there was no proof of culpable negligence.

Conclusion.

I conclude that the People have not sustained the burden of proof or established beyond a reasonable doubt that any of the defendants are guilty of the crime of manslaughter by culpable negligence.
*243 Findings of fact and conclusions of law heretofore reached in this opinion are implicit in my verdict as the judge of the facts and the law.
I find all of the defendants not guilty.

 Appendix omitted by court.

 Appendix omitted by court.