Mitchell D. Schweitzer, J.
The defendant moves for an inspection of the Grand Jury minutes and for a dismissal of the indictment on the ground that the evidence before the Grand Jury was legally insufficient to sustain this indictment for manslaughter in the second degree. The claim is made that the evidence does not overcome the reasonable hypothesis that the death of the deceased was purely accidental, thereby failing to establish prima facie criminal responsibility on the part of the defendant (Penal Law, § 1054). The evidence before the Grand Jury (taken as true for this motion) establishes the following.
On July 31, 1967, at about 6:45 p.m., a patrolman, on radio motor patrol, responded to an alarm and proceeded to 350 Bleecker Street. The superintendent of the building opened the door of apartment 3G and, upon entering, the patrolman saw a body lying on the floor. He observed a wound in the left chest area. The telephone receiver at the time was off the hook. Later that same evening, a detective assigned to the investigation questioned the defendant whom he had found sleeping in another apartment (not that of the defendant) in the same building. After the detective gave the defendant the Miranda-mandated admonitions, the defendant related the following. He stated that he knew the deceased and acknowledged that there had been a shooting in the latter’s apartment on the afternoon of that day. However, he gave no indication that he knew that his friend had died. He stated that he had been out shopping that afternoon, and, on the way home to his apartment at 106 Charles Street he had passed 350 Bleecker Street and walked up to his friend’s apartment. After speaking to his friend, he left and returned to his own home.
He had felt very depressed at the time of his return home and although he made no disclosure of any argument with his friend, he stated that he decided to commit suicide in his friend’s apartment and in the latter’s presence because he wanted his friend to see him die. He thereupon armed himself with a .38 calibre revolver and returned to the apartment of the deceased. Once inside, he started to cock the gun in order to carry out his plan of self-destruction. At this point, he recalled that the deceased tried to stop him. He heard a gun-shot, after which everything went blank. He recalled speaking to the deceased who had fallen to the floor, and telling him he would be all right, and that he, the defendant, would make -a telephone call. He stated that he tried to call the police; but no record of any call, however, could be found.
*311 The defendant then stated that he ran out of the apartment, taking the gun with him. He identified a gun, which the detective had retrieved from a car owned by a friend of the defendant, as the .38 calibre revolver which had been fired in the apartment of the deceased.
On being questioned as to his movements after the shooting, the defendant stated that he had returned to his own apartment at 106 Charles .Street. There he had met a friend whom he asked to drive him out of town to see a doctor. They then drove to New Jersey. His purpose was to hospitalize himself for psychiatric treatment but, he stated, he was unsuccessful in his effort. Questioned as to what he did with the gun, he stated that he had wiped it off with his T-shirt and had given it to his friend, who concealed it under the passenger seat of his, the friend’s, car. The defendant also stated that, after the shooting, he made no attempt to carry out his original plan of suicide. He also stated, in response to a question as to why he had wanted his friend to witness his suicide, that he and the deceased had enjoyed a very close relationship but that it was not proceeding as well as he desired and, as a result, he had become depressed.
The defendant, in this factual setting, has been indicted for manslaughter in the second degree, in that he, by his act, procurement, and culpable negligence, killed the deceased by pointing and discharging a loaded pistol at him, said act not being justifiable or excusable (Penal Law, § 1052, subd. 3).
The facts of the case present a classic example of a proper application of the catch-all or omnibus subdivision 3 of section 1052, defining manslaughter in the second degree. On the facts disclosed, even if the defendant’s version be fully accepted, the jury should be called upon to resolve the factual issues emanating therefrom.
Under the circumstances disclosed by the defendant, self-serving as his story may be, a petit jury would be warranted in finding that the defendant had reasonable grounds for believing that the deceased, a 20-year-old-youth, with whom he had enjoyed a close relationship, would react exactly as he did — by taking affirmative action to frustrate the defendant’s attempt at self-destruction. By his own conduct, he deliberately and knowingly set in motion this sordid tableau. He triggered the reaction which he must reasonably have foreseen would occur. He stimulated the deceased into taking affirmative action which the defendant had every reason to believe would place his friend in jeopardy of his life — as indeed it did. In a case involving the same charge of manslaughter in the second degree, *312 Mr. Justice Sobel used this most pertinent language: “The jury should he instructed to weigh the nature and purpose of the defendant’s conduct, the nature and degree of the risk consciously disregarded by the defendant and all the circumstances known to the defendant in acting. The jury will then be required to determine whether or not the defendant was actually and consciously aware of the fact that by his acts or his omissions, he was creating a risk; that the risk created was both unreasonable and unjustifiable under all the circumstances established by the evidence; that for a risk to be both unreasonable and unjustifiable, it must involve conduct so highly culpable and blameworthy as to be tantamount or equivalent to an intent to injure another; and that the defendant in disregarding such a risk knew or should have known that the probable (as distinguished from possible) consequences of his conduct would result in death or serious injury to another.” (People v. Joseph, 11 Misc 2d 219, 241-242.)
The defendant’s prime thrust is his contention that, assuming the existence of all the facts disclosed by the defendant, nevertheless the evidence adduced establishes conclusively a noncriminal homicide as a result of an accident. He relies upon that provision of our Penal Law (§ 1054) which provides that a homicide is excusable when committed by accident and misfortune, ‘ ‘ in lawfully correcting a child or servant, or in doing any other lawful act, by lawful means, with ordinary caution, and without any unlawful intent.” (Emphasis supplied.)
The issue of law squarely emerges: does the evidence adduced before the Grand Jury establish the existence of a nonculpable homicide by virtue of the defendant’s contention that the shooting at most constituted an excusable homicide í I think not.
There is a complete dearth of judicial precedent on the subject in the State of New York. It is true, as the defendant urges, that section 2302 of the Penal Law, which was derived from the former section 174 of the Penal Code (L. 1881, ch. 676) was repealed by chapter 414 of the Laws of 1919 (§ 1, eff. Sept. 1, 1919). It cannot, therefore, be said that the death of the deceased was committed by the defendant while violating any section of the Penal Law relating to suicide. There is, however, a declared public policy in relation to suicide. Although suicide is not, as it was at common law, a crime, it is considered “a grave public wrong” (Penal Law, § 2301). In at least one case our Court of Appeals has declared that an act of suicide ‘ ‘ may fairly be called an illegal act. ’ ’ In this connection, the court stated: “ It is, to say the least, doubtful *313 whether the rule of the common law, declaring suicide to he malum in se, has been abrogated by the provisions of our Penal Code; but whether we invoke the stern morality of the common law, or the more merciful decree of our own statute which declares suicide to be a ‘ grave public wrong,’ it may fairly be called an illegal act within the purview of the language of the contract herein, and, if so, the contract is rendered nugatory by force of its own provisions.” (Shipman v. Protected Home Circle, 174 N. Y. 398, 406 [1903].)
In this court’s own research of cases in other jurisdictions, the one case that appears to be persuasive on the issue in the instant case is Commonwealth v. Mink (123 Mass. 422 [1877]). In that case, the court held that, although an attempt to commit suicide is not punishable as a crime, yet a person who, in attempting to kill himself, accidentally kills another who is trying to prevent such suicide, is guilty of manslaughter. The language of Chief Justice Gray is particularly significant and apposite.
“ Since it has been provided by statute that 1 any crime punishable by death or imprisonment in the state prison is a felony, and no other crime shall be so considered, ’ it may well be that suicide is not technically a felony in this Commonwealth. Gen. Sts. c. 168, § 1, St. 1852, c. 37, § 1. But being unlawful and criminal as malum in se, any attempt to commit it is likewise unlawful and criminal. Every one has the same right and duty to interpose to save a life from being so unlawfully and criminally taken, that he would have to defeat an attempt unlawfully to take the life of a third person. Fairfax, J., in 22 E. IV. 45, pl. 10. Marler v. Ayliffe, Cro. Jac. 134. 2 Rol. Ab. 559. 1 Hawk c. 60, § 23. And it is not disputed that any person who, in doing or attempting to do an act which is unlawful and criminal, kills another, though not intending his death, is guilty of criminal homicide, and, at the least, of manslaughter.” (p. 429). (See, also, State v. Levelle, 34 S. C. 120 [1891].)
On the civil side, it has been held that a person who is injured while attempting to save the life of another who attempts suicide in a place where others may be expected to be, may have an actionable cause in negligence. This rule is laid down by Professor Bohlen in his “ Studies in the Law of Torts ” (p. 569) wherein he states: “ The rescurer’s right of action, therefore, must rest upon the view that one who imperils another, at a place where there may be bystanders, must take into account the chance that some bystander will yield to the meritorious impulse to save life or even property from destruc *314 tion, and attempt a rescue. If this is so, the right of action depends not upon the Avrongfillness of the defendant’s conduct in its tendency to imperil the person Avhose rescue is attempted, but upon its tendency to cause the rescuer to take the risk involved in the attempted rescue. And it Avould seem that a person who carelessly exposes himself to danger or who attempts to take his life in a place where others may be expected to be, does commit a wrongful act towards them in that it exposes them to a recognisable risk of injury.” (Emphasis supplied.)
Further, as precluding, at this stage, a claim of excusable homicide by virtue of “ accident and misfortune * * * in doing any other lawful act, by lawful means, with ordinary caution, and without any unlawful intent ” (Penal Law, § 1054), is the defendant’s admission, in effect, that he purposed to discharge the revolver in a place where there was a ‘1 person to be endangered thereby ” (Penal Law § 1904, subd. 4, par. [a] [as renumbered in 1963 from former § 1906]).
Pertinent is the language of Eder, J., in Gross v. Goodman (173 Misc. 1063, 1064): “ It is a penal offense for a person, otheTAvise than in self-defense or in the discharge of official duty, to willfully discharge any species of firearm in a public place or in any place where there is any person to be endangered thereby, although no injury to any person ensues. (Penal Law, § 1906.) Death resulting from an act of culpable negligence may constitute manslaughter. (Penal Law, § 1052; People v. Heineman, 211 N. Y. 475, 480; People v. McCarthy, 110 id. 309.) The defendant was not acting in self-defense or in the discharge of official duty and hence had no lawful right to discharge his pistol, which was a willful and intentional act. * * * His act in firing the revolver was still unlawful.” (See, also, People v. Jacobus, 17 A D 2d 223 [1962].)
In the light of all of the foregoing, and in view of the declared public policy that suicide is “ a grave public wrong” (Penal Law, § 2301) and has been characterized as “an illegal act ” (although not punishable as a crime) and “ malum in se ” (Shipman v. Protected Home Circle, supra), and that the discharge or attempted discharge of the revolver under the circumstances disclosed was in itself unlawful (Penal Law, § 1904), it must be held that the evidence adduced before the Grand Jury, if unexplained or uncontradicted, would warrant a conviction by a trial jury (Code Crim. Pro., § 251).
The motion is denied in all respects.